2001 OK CR 1

**Danny Keith HOOKS, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. D–98–1231.

Court of Criminal Appeals of Oklahoma.

Jan. 22, 2001.

As Corrected on Denial of Rehearing
March 12, 2001.

302

Irven Box, Box & Box, Oklahoma City, OK, attorney for defendant at trial.

Robert H. Macy, Oklahoma County District Attorney, Brad Miller, Assistant District Attorney, Robert S. Kerr, Oklahoma City, OK, attorneys for the State at trial.

Janet Chesley, Michael D. Morehead, Capital Direct Appeals, Indigent Defense System, Norman, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

CHAPEL, JUDGE:

¶1 Danny Keith Hooks was tried by jury and convicted of five counts of Murder in the First Degree in violation of 21 O.S.1991, § 701.7, in the District Court of Oklahoma County, Case No. CF–97–657. The jury found two aggravating circumstances for each count: (1) that Hooks had been previously convicted of a felony involving the use or threat of violence to the person; and (2) that the murder was especially heinous, atrocious, or cruel.[1] In accordance with the jury's recommendation the Honorable Daniel L. Owens sentenced Hooks to death on each count.

¶2 On May 16, 1992, the bodies of Phyllis Adams, LaShawn Evans, Sandra Thompson, Carolyn Watson, and Francill Roberts were found in a small bedroom in a crack house. Each woman was gagged and had been stabbed several times. The bodies were nude and Thompson, Watson, and Roberts were bound.[2] The room was in disarray and the victims' purses appeared to have been searched. There were no drugs or money in the house.

¶3 Although there were five victims in a confined space, the evidence suggested one person committed the crimes. The women were killed in the bedroom. A trail of blood drops led to the front door, and Luminol testing showed a single set of bloody footprints also leading from the bedroom to the front door. There was a great deal of the victims' blood in the bedroom. However, the blood trail to the door, and some other blood drops found at various places in the bedroom, did not come from any of the victims. A bloody palm print was on the west wall of the bedroom closet, and police found a bloody boot print with "Honchos" embossed on the sole. Despite a thorough investigation police found nobody who matched either the palm print or the blood drops. In 1995 samples of the blood drops were submitted for DNA testing, and those results were distributed nationally in 1996. In 1997, California penal authorities informed the Oklahoma State Bureau of Investigation (OSBI) that they had a person with that DNA profile. Subsequent tests confirmed that the blood trail, drops in the bedroom, and bloody palm print all belonged to Hooks. DNA from semen found in Roberts's mouth was also consistent with Hooks' DNA.

¶4 Hooks admitted he was at the house. He testified he went there during the evening of May 15th, and sometime close to or shortly after midnight on May 16th he was there smoking crack cocaine with all the victims. Hooks said he only knew the woman who rented the house, and could not remember any of the victims' names. He said he had "regular" sex with one woman and oral sex with another. During the night they ran out of crack and Hooks gave two of the women $30 to go buy more. After they returned and finished smoking, he ran out of drugs and money and left. Hooks said he got home—about a mile from the house— around 2:00 a.m. He decided to go back sometime after 4:00 a.m. On the way, he cut his left index finger falling off his bicycle while trying to fix the kick stand. When he got there the house was dark and the door was ajar. He pushed it open and entered cautiously, closing the door behind him, went to the bedroom and saw the bodies, and went back to the front door. He lifted the curtain and looked outside, then decided to go back in and check on the victims in case anyone was alive. He returned to the bedroom and determined each victim was dead. After he checked Evans's body he picked up a shirt and wrapped it around his cut finger. Hooks looked at the contents of the victims' purses on the west bed, then knelt and looked under

---

1. 21 O.S.1991, § 701.12. The Bill of Particulars also alleged that Hooks knowingly created a great risk of death to more than one person, that the murders were committed for the purpose of avoiding arrest or prosecution, and the existence of a probability that Hooks would commit criminal acts of violence that would constitute a continuing threat to society. The jury did not find these aggravating circumstances.

2. Adams was partially clothed but her brassiere and shirt were pulled up, exposing her chest area. Evans and Adams were not bound, but evidence suggested at one time Adams's hands had been tied.

the clothes in the closet. He then left the house, dropping the shirt by the front door, and closed the door. Hooks did not tell anyone what he had seen because he was afraid the authorities would revoke his California parole for being in a crack house. Two weeks later he left the area. In November he was arrested in Holdenville, Oklahoma, on a domestic complaint and returned to California.

## ISSUES RELATING TO JURY SELECTION

¶ 5 In Proposition IX Hooks claims he was denied his right to a jury composed of a fair cross-section of the community through systematic under-representation of African–Americans from the jury panel. Out of a jury venire of 65 persons called to hear Hooks's case, four or five appeared to be African–American. Trial counsel objected to the racial makeup of the venire, and continued to object to the racial makeup of the panel throughout the case. Counsel made an oral motion to quash the panel at the end of the first day of voir dire. This was denied after some discussion on the record. The trial court noted that it had no control or influence over the racial makeup of the venire, which was summoned on a random selection basis using driver's license rolls.

¶ 6 The State first argues that Hooks waived this claim by failing to file a written motion to quash the panel. Oklahoma law requires a venire challenge to be in writing, specifying the facts which constitute the grounds for the challenge.[3] Hooks argues counsel substantially complied with the intent behind the statute, since the trial court was alerted to the exact problem with the venire and a record was made which enables this Court to review the error. We agree both that the claim was waived under the law and that a sufficient record enables us to review Hooks's claim. In keeping with the heightened level of scrutiny required in capital cases, we have reviewed the claim and conclude Hooks has not shown error.

¶ 7 In order to prove he was denied a jury composed of a fair cross-section of the community Hooks must show: (1) the excluded group is distinctive in the community; (2) the group's representation in the jury pool is not fair and reasonable in relation to the number of people in the community; and (3) the under-representation is due to systematic exclusion in the jury selection process.[4] Hooks presents a meticulous argument, using a variety of statistical models, to show that African–Americans were woefully under-represented on his venire. We need not adopt any of these statistical methods to resolve this issue. Assuming without deciding that Hooks has shown under-representation, he completely fails to show that this was caused by systematic exclusion in the selection process. This Court has found the Oklahoma jury selection method does not *per se* systematically exclude African–Americans.[5] To overcome this, Hooks argues first that the degree of under-representation must indicate a systemic defect in either the method of selection or the assignment of jurors to individual courtrooms. We decline this suggestion that we assume systematic bias rather than requiring evidence of it. Hooks next argues systematic exclusion is proved by the Oklahoma County Court Clerk's failure to secure jurors who do not answer the summons to duty. He claims this ensures large identifiable classes of jurors are excluded, but offers nothing to suggest either that this is true or that those persons are African–American. He claims the Oklahoma County practice giving trial courts control of jury selection in individual cases constitutes a factor within the State's control giving rise to systematic exclusion. Again, Hooks offers nothing to prove this actually leads to exclusion beyond his claim that the statistical

3. 22 O.S.1991, § 634; *Lauhoff v. State*, 1973 OK CR 127, 508 P.2d 285, 286–87 (failure to file written motion waives challenge).

4. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

5. *Alverson v. State*, 1999 OK CR 21, 983 P.2d 498, 517, *cert. denied*, 528 U.S. 1089, 120 S.Ct. 820, 145 L.Ed.2d 690 (2000); *Trice v. State*, 1993 OK CR 19, 853 P.2d 203, 207–08, *cert. denied*, 510 U.S. 1025, 114 S.Ct. 638, 126 L.Ed.2d 597; *Fox v. State*, 1989 OK CR 51, 779 P.2d 562, 566, *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990).

anomaly itself proves African–Americans must have been systematically excluded. The United States Supreme Court has found systematic exclusion where states explicitly excluded particular groups of people from jury service, or erected a racially non-neutral selection process.[6] Hooks shows nothing similar. We have already upheld Oklahoma's statutory jury selection method and will not, without some proof, find it systematically excludes minorities on the strength of statistical disparity alone. This proposition is denied.

## ISSUES RELATING TO FIRST STAGE PROCEEDINGS

¶ 8 In Proposition I Hooks claims the evidence was insufficient to convict him of first degree murder. The State's case against Hooks was built on strong circumstantial evidence.[7] Circumstantial evidence must exclude every reasonable hypothesis other than guilt.[8] We will accept all reasonable inferences and credibility choices which tend to support the jury's verdict.[9] Taken together, the evidence presented at trial meets this standard. We disagree with Hooks's claim that his story raised a credible reasonable hypothesis of innocence. Circumstantial evidence connecting Hooks to the murders includes:

- Drops of Hooks's blood in the bedroom. Drops were found near some of the victims, on clothing and items under the west bed and underneath other items on that bed, and on the sleeve of a jacket

which was underneath Evans's head when the bodies were discovered.

- Hooks's blood formed a trail of drops leading from the bedroom to the front door. Several drops were found in front of the door and on the jamb, and Hooks's blood was smeared on the inside surface of the front door's window curtain. These drops paralleled a single bloody trail of footprints leading from the bedroom out the front door.

- Hooks's palm print in blood was found in the bedroom closet where Adams was attacked.

- Semen consistent with Hooks was found in Roberts's mouth.

- Evidence suggested that someone wearing work boots walked through blood in the bedroom while at least some of the victims were being killed. Those boots were not found, but witnesses agreed that Hooks usually wore work boots in April and May of 1992.

- Witnesses agreed Hooks was familiar with the house, had bought crack cocaine there many times, and knew at least one of the victims.

¶ 9 Rather than contest the DNA evidence Hooks chose to admit his presence at the scene of the crime before and after the murders. However, Hooks's story was contradicted by evidence that Adams and Watson were with other people and got to the house sometime between 4:00 and 4:30 a.m. on May 16th; they could not have been partying with him between 12:30 and 2:00 a.m. His description of his actions in the bedroom did not

---

6. *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (non-neutral "key-man" selection system excluded Mexican–Americans); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (analogy to jury selection, systematic exclusion shown where no African–Americans on venire and jury commissioners not told of eligible jurors, or showing of racially non-neutral selection process); *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (State conceded systematic exclusion where women were not summoned for jury service unless they had previously filed a written declaration of wish to serve).

7. The State suggests that Hooks was convicted by direct evidence. Despite some anomalous cases suggesting otherwise, a defendant's testimony

does not provide direct evidence unless he includes actual direct evidence of the crime. *See Hooper v. State*, 1997 OK CR 64, 947 P.2d 1090, 1103, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2353, 141 L.Ed.2d 722 (1998); *Mollett v. State*, 1997 OK CR 28, 939 P.2d 1, 9, *cert. denied*, 522 U.S. 1079, 118 S.Ct. 859, 139 L.Ed.2d 758 (1998); *Hill v. State*, 1995 OK CR 28, 898 P.2d 155, 156.

8. *Miller v. State*, 1998 OK CR 59, 977 P.2d 1099, 1107, *cert. denied*, 528 U.S. 897, 120 S.Ct. 228, 145 L.Ed.2d 192 (1999); *Hooper*, 947 P.2d at 1103; *Mollett*, 939 P.2d at 9.

9. *Hooper*, 947 P.2d at 1103; *Bryan v. State*, 1997 OK CR 15, 935 P.2d 338, 358, *cert. denied*, 522 U.S. 957, 118 S.Ct. 383, 139 L.Ed.2d 299 (1997).

account for drops of his blood found on items under the west bed, nor did he explain how his blood could have soaked into a jacket under Evans's head. Although he described looking at items identifying the victims on the west bed, many of these were covered by clothing or other debris when the bodies were found. His explanation of the bloody palm print appeared somewhat confused. While portions of Hooks's story are plausible, compared with the physical evidence it does not exclude every reasonable hypothesis other than guilt. This proposition is denied.

¶ 10 In Proposition III Hooks argues the trial court erred in refusing to allow the defense to present a witness regarding his work boots. The State went to a great deal of effort to connect Hooks to "Honchos" work boots matching the bloody footprint. The State admitted as a demonstrative exhibit a pair of Honcho boots bought by police in 1992 after the crimes, then suggested to witnesses and argued to the jury that Hooks owned similar boots. The State also extensively cross-examined Hooks about his boots. Hooks admitted owning two pairs of boots in 1992—a pair of Army boots and lace-up work boots. He denied owning "Honchos" boots. Hooks said he didn't know what happened to his Army boots, but he left his work boots with his family when he was returned to California in November, 1992. After trial began, as the State began emphasizing this evidence, trial counsel asked Hooks's family to find his work boots. After seven days of voir dire and evidence, during Hooks's case in chief, a family member brought Hooks's boots from Holdenville to the Oklahoma County courthouse. Over Hooks's objection the trial court refused to allow a witness to sponsor the boots. This decision was error.

¶ 11 On appeal the State first suggests Hooks knew through preliminary hearing testimony that the bloody bootprint was important evidence. However, there was no evidence about the bootprint presented at preliminary hearing. The State then erroneously claims that the trial court's decision was merely an advisory ruling on a motion in limine, and Hooks has waived this issue on appeal. The State apparently reaches this conclusion from a desire to avoid addressing the issue, as it is completely unsupported by the record. After a long colloquy the trial court definitively ruled that Hooks would not be allowed to present the boots or any evidence indicating they had been found. There was nothing advisory about this decision, and the issue was preserved for review.

¶ 12 The trial court explicitly excluded the evidence because to admit the boots "would absolutely violate the principles that we all have relating to mutual and open discovery." The trial court held the issue was not one of nondisclosure but found admitting the evidence would be extremely prejudicial to the State's case.[10] This decision is contradicted by well-settled case law holding that exclusion of defense evidence is a harsh sanction almost never appropriate in capital cases. We have often held that this sanction is too severe a remedy for discovery violations where the evidence is material and the violation is not blatant, willful or calculated.[11] Here the record supports the conclusion that the discovery violation was at best inadvertent and at worst unavoidable (counsel did not have the evidence until the day it was presented). As we discuss below, the evidence was material. Hooks's counsel indicated he would not object to a continuance for the State to examine the boots and sponsoring witness. However, the trial court and State apparently did not even consider this option. As Hooks notes, we routinely require defendants in these circumstances to request a continuance for adequate time to prepare.[12] We should hold the State to the same requirement.

---

10. This conclusion is not supported by the evidence. The State could have argued to the jury, as it did to the trial court, that it was unlikely these boots were actually the boots Hooks wore in 1992.

11. *White v. State*, 1998 OK CR 69, 973 P.2d 306, 310–311; *Allen v. State*, 1997 OK CR 44, 944 P.2d 934, 937; *Wisdom v. State*, 1996 OK CR 22, 918 P.2d 384, 396, *cert. denied*, 528 U.S. 1020, 120 S.Ct. 529, 145 L.Ed.2d 410 (1999); *Morgan v. District Court of Woodward County*, 1992 OK CR 29, 831 P.2d 1001, 1005.

12. *Moss v. State*, 1994 OK CR 80, 888 P.2d 509, 515; *Thomas v. State*, 1991 OK CR 58, 811 P.2d 1337, 1342, *cert. denied*, 502 U.S. 1041, 112 S.Ct. 895, 116 L.Ed.2d 798 (1992).

¶ 13 The State argues the boots were not material because Hooks admitted to having two pairs of boots and presentation of one could not rule out the other as the crime scene boots. This, like the suggestion that Hooks's family bought the boots second-hand to help his case, goes to the evidence's credibility. The State appears to argue: (1) the boots the prosecutor claimed Hooks owned, which made the bloody footprint, were material; but (2) boots presented by the defense as Hooks's actual boots were not material to the case. This makes no sense. Either Hooks's boots had evidentiary value or they did not. We agree with the State that the bloody bootprint was material and find Hooks should have been allowed to present evidence bearing on that issue.

¶ 14 The trial court mechanistically applied a discovery rule and prohibited Hooks from introducing material evidence relevant to guilt or innocence during his case in chief.[13] We do not approve the unnecessary imposition of this harsh sanction in this case. However, a thorough review of the record persuades us that the error neither resulted in a miscarriage of justice nor substantially violated Hooks's statutory or constitutional rights.[14] Even without connecting Hooks to the bloody bootprint, the prosecution connected him to the crime through DNA and palmprint evidence. Other witnesses testified Hooks was familiar with the house and some of the victims. We conclude beyond a reasonable doubt that this error was harmless.[15] We also examine the error for its effect on second stage. Although it is possible that, had Hooks been able to introduce boots without the "Honchos" soles, jurors might have concluded a second person was also responsible for the killings and declined to impose the death penalty, jurors could have reached that conclusion based on the State's failure to solidly connect Hooks to the "Honchos" boots. We conclude the error

did not affect the jury's second stage verdicts. This proposition is denied.

¶ 15 In Proposition V Hooks claims hearsay testimony concerning a police report improperly bolstered Billy Ray Johnson's trial testimony. Billy Ray Johnson testified that he took Hooks to the house to buy crack. Johnson initially said he wasn't sure which woman Hooks was going with, that it could have been the youngest one who just had her baby or "that other one." Johnson remembered telling police that it was the youngest one and Hooks knew her "real well." To clear up any confusion, the prosecutor then read Johnson's prior consistent statement to police, and Johnson agreed with it. Hooks did not cross-examine. Hooks does not contest the propriety of this exchange on appeal.

¶ 16 After Johnson testified prosecutors called Officer Burke to read his report on Johnson's statement. Hooks's objection was overruled and this issue was preserved for appeal. Hooks correctly complains that prosecutors should not have been allowed to bolster Johnson's testimony with this prior consistent statement, which was both hearsay and extrinsic evidence. The State appears to misunderstand this claim. Hooks is not claiming the State had no right to impeach its own witness. Hooks is claiming the State properly impeached its witness by offering Johnson the prior consistent statement and allowing him the opportunity to explain or deny it.[16] Johnson agreed with the statement. There was no need for Officer Burke to provide hearsay further bolstering Johnson's testimony. Officer Burke's evidence was offered solely to prove the truth of the matter asserted, and it does not fall under any exception to the hearsay rule. This Court has found error before where the same officer gave substantially similar testimony.[17] However, here we find beyond a

---

13. *Fitzgerald v. State,* 1998 OK CR 68, 972 P.2d 1157, 1171; *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973); *Green v. Georgia,* 442 U.S. 95, 97, 99 S.Ct. 2150, 2151–52, 60 L.Ed.2d 738 (1979).

14. 20 O.S.1991, § 3001.1.

15. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

16. Hooks cites by analogy 12 O.S.1991, § 2613, governing admissibility of extrinsic evidence of prior inconsistent statements.

17. *Omalza v. State,* 1995 OK CR 80, 911 P.2d 286, 306.

**308**

reasonable doubt that the improperly admitted hearsay did not contribute to Hooks's convictions and sentences.[18] This proposition is denied.

¶ 17 In Proposition VI Hooks alleges the trial court erred by permitting the State to introduce evidence of other bad acts that were not part of the transaction resulting in the death of the victims. Over Hooks's strenuous objections the prosecution repeatedly elicited evidence that Hooks was interested in group sex. There were some sexual overtones at trial since the victims were nude women, four had old semen from various donors present in their bodies, and Hooks admitted having sex with two victims. No sex crimes were charged. Both parties agree a defendant should ideally be convicted by evidence showing his guilt of the offense charged, rather than by evidence of other crimes or bad acts.[19] Prosecutors admitted this material was not included in a *Burks* notice[20] but argued both: (1) Hooks's interest in group sex was not illegal and thus not subject to *Burks*, and (2) sex with multiple partners showed Hooks's proclivity for group sex. This argument is self-contradictory. Prosecutors used this evidence to argue that Hooks had a deviant, depraved nature and constituted proof that Hooks murdered the victims. In second stage, Mr. Macy appeared to argue that sex with multiple partners was itself evidence of a continuing threat to society.

¶ 18 On appeal the State contends this evidence was relevant since Hooks admitted he had intercourse with two of the victims that night. On the contrary, since Hooks made this admission (concerning the only sexually-related issue in the case) whether he enjoyed or fantasized about group sex with other women was wholly irrelevant. The State also unconvincingly argues without explanation that Hooks's penchant for group sex was relevant simply because these victims were nude. There simply is no credible argument that this evidence was relevant to any issue raised in the first stage of trial.[21] After thoroughly reviewing the record, we conclude that this error did not unduly prejudice Hooks. While the jury may have agreed with prosecutors that Hooks's enjoyment of group sex was repugnant, that information was ultimately irrelevant to the issue of whether Hooks stabbed the five victims. The murder charges were well-supported by relevant evidence. Erroneously admitting this other crimes evidence neither constituted a miscarriage of justice nor deprived Hooks of a statutory or constitutional right.[22] This proposition is denied.

## ISSUES RELATING TO SECOND STAGE PROCEEDINGS

¶ 19 In Proposition VII Hooks argues that his jury was coerced into returning a death sentence. After five hours of second-stage deliberations the jury sent a note indicating they were 11–1 for the death penalty and asking the trial court to interview the holdout juror and replace her with an alternate. The trial court answered that the law did not authorize the court to grant that request and told the jury to continue deliberation. Within ten minutes the jury returned a note saying "We are unable to reach any unanimous sentence."

¶ 20 The trial court and counsel discussed possible avenues of reply after the first note. The trial court read aloud the appropriate

18. *Id.*

19. *Burks v. State*, 1979 OK CR 10, 594 P.2d 771, 774, *overruled in part on other grounds by Jones v. State*, 1989 OK CR 7, 772 P.2d 922.

20. The State admits this on appeal but suggests Hooks was "put on notice" that the evidence would be used. In the statement of evidence to be used to support the Bill of Particulars the State listed evidence of violent sex as well as sex with multiple partners. We cannot agree that this document, giving notice of second stage evidence

offered to prove a single aggravating circumstance, was sufficient notice that Hooks would have to defend against this evidence of bad acts during the guilt/innocence phase of trial.

21. During the second stage the State offered evidence of multiple partners as well as violent intercourse to prove Hooks was a continuing threat. As the jury did not find that aggravating circumstance, we need not determine the admissibility of this evidence.

22. 21 O.S.1991, § 3001.1.

capital sentencing deadlock instruction, OUJI–CR (2d) 4–83. The State objected to that instruction because the jury had not been out long enough to justify something like an *Allen* charge. The trial court agreed OUJI–CR (2d) 4–83 was similar to an *Allen* charge but stated the OUJI comment "does not make a lot of sense" and said it would not give that instruction. Trial counsel requested "the *Allen* charge" "telling them to go back and do that as opposed to anything else that we could instruct." The trial court decided not to give any instruction beyond urging the jury to resume deliberations.

¶ 21 After the second note announcing a deadlock, the trial court overruled Hooks's motion for a mistrial. The trial court announced it did not believe jurors had been out long enough to declare a mistrial and stated it would give an *Allen*[23] charge, OUJI–CR (2d) 10–11. Trial counsel objected, saying, "We think that the *Allen* charge and instruction given is not an appropriate instruction to be given to a jury in the stage two deliberation since there is such an overlap of moral and legal issues." The trial court overruled this objection and refused counsel's request to ask jurors whether further deliberation would be helpful before giving the *Allen* instruction. The trial court then called the jury in. The court told jurors the case had taken approximately 57 hours of trial time, and they had only deliberated for six and a half hours. The court then gave OUJI–CR (2d) 10–11, including the following language:

> This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or affect [sic] of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision. No juror should ever agree to a verdict that is contrary to the law and the Court's instruction nor find a fact or concur in a verdict which in good conscience he or she believes to be untrue.
>
> If at all possible, you should resolve any differences and come to a common conclusion so this case may be completed.

¶ 22 Sometime before 7:30 p.m., deliberations recessed while two jurors moved their cars. During this time the jury sent a note asking for its evening break. The trial court sent the jury to dinner while the court and counsel discussed the note. Everyone realized that the jurors expected to go home, as they had during first stage deliberations. Both Hooks and the State objected to breaking sequestration during second stage deliberations. The trial court reserved a motel in case jurors wanted to break for the evening and proposed telling jurors that before they resumed deliberations. The court denied trial counsel's request to first ask jurors whether further deliberation would be helpful. Trial counsel confirmed that the court would not declare the jurors at an impasse, then announced no objection to the motel procedure.

¶ 23 After the jurors finished dinner, at approximately 8:20 p.m., the trial court called them in "to discuss some logistical issues." Emphasizing that the jury should deliberate at its own pace, the court explained motel rooms were reserved should the jurors care to break for the evening and resume deliberations the next day. The court said jurors were free to continue deliberations into the night, but needed to decide whether to use the motel rooms by 10:30 p.m. If so, family members could bring overnight items to the courthouse for jurors to use. The court stated it needed an answer from jurors "shortly" so it could proceed with as little inconvenience as possible, and noted, "But for the course of this proceeding I cannot release you to go to your respective dwellings." The court then released jurors to continue deliberations. Forty-five minutes later the jury returned with verdicts of death on all counts.

¶ 24 Hooks claims the trial court erred in several ways during this sequence of events, and that under the peculiar circumstances of this case the errors resulted in a coerced verdict. We agree the trial court failed to give the correct deadlock instruction and should have repeated the *Allen* language cited above in his final instruction to the jury. However, for reasons discussed below, we do

23. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) (encouraging dead- locked juries to continue deliberations and reach a verdict).

not believe these errors coerced the verdict, and they do not require relief. The State's brief cites no law and discusses only one case cited by Hooks.

¶ 25 Hooks first claims the trial court should not have told jurors they could not return to their homes until the close of the proceedings. This is an accurate statement of law—the jury was sequestered and jurors could not be separated until they either reached a verdict or an impasse was declared. Hooks argues that it is nonetheless error because, in context, it suggested jurors could not leave until they had a unanimous verdict. The trial court knew that, several hours earlier, the jury had announced an 11–1 deadlock. Hooks claims that under these circumstances the trial court's announcement put unbearable pressure on the holdout juror. He argues that the quick return of a verdict after this instruction suggests coercion.[24] We are mindful of that inference but cannot agree that the trial court's accurate statement of law was either explicitly or inherently coercive.

¶ 26 Hooks correctly complains that, when releasing the jury for further deliberation after dinner, the trial court should have admonished jurors not to abandon their honestly held beliefs. Well-settled law indicates that this exhortation is necessary whenever a deadlocked jury is returned to deliberations.[25] In a similar case this Court recently found this omission to be reversible error.[26] According to the last substantive communication from Hooks's jury, it was deadlocked 11–1 in favor of death. Under those circumstances the trial court had a duty to ensure each juror understood his or her obligation to

hold fast to firm convictions, and not to concur in a finding or verdict simply to reach a unanimous decision. The trial court should have included this admonition to Hooks's jury when releasing it for evening deliberations.

¶ 27 Under the circumstances of this case we do not find this error requires reversal. We distinguish *Mooney*. There, in addition to the failure to properly admonish the jurors there was an unauthorized communication with the bailiff which caused the whole proceeding to go off on a tangent. The trial judge concentrated on which juror should initiate and sign notes to the court, vested the foreman with too much authority, did not answer the jury's question, and did not appropriately instruct the apparently deadlocked jury. Here there is no claim of improper communication or confusion engendered by the trial court's other after-dinner instructions. Hooks's jury had received a proper *Allen* instruction, including the admonition at issue, within the preceding two or three hours. There were no intervening substantive communications or instructions between the *Allen* instruction and the after-dinner exchange.

¶ 28 Hooks claims the trial court erred in refusing to give the capital deadlock instruction, OUJI–CR (2d) 4–83. Hooks is right. This instruction repeats the relevant statutory language: [27]

If on further deliberation you are unable to agree unanimously as to punishment, I shall discharge you and impose a sentence of imprisonment for life without the possi-

24. *Lowenfield v. Phelps*, 484 U.S. 231, 240, 108 S.Ct. 546, 552, 98 L.Ed.2d 568 (1988); *United States v. United States Gypsum Co.*, 438 U.S. 422, 462, 98 S.Ct. 2864, 2885–86, 57 L.Ed.2d 854 (1978). *See also Bollenbach v. United States*, 326 U.S. 607, 66 S.Ct. 402, 406, 90 L.Ed. 350 (1946) (error in instruction not harmless where jurors were hung for seven hours but returned with guilty verdict five minutes after erroneous instruction).

25. *Mooney v. State*, 1999 OK CR 34, 990 P.2d 875, 893; *Drew v. State*, 1989 OK CR 1, 771 P.2d 224, 229; *Brogie v. State*, 1985 OK CR 2, 695 P.2d 538, 545; *Miles v. State*, 1979 OK CR 116, 602 P.2d 227, 228. *See also Kamees v. State*,

1991 OK CR 91, 815 P.2d 1204, 1207 (instruction admonishing deadlocked jury not to surrender honest convictions proper); *Lowenfield*, 484 U.S. at 241, 108 S.Ct. at 552 (no coercion where deadlocked jury instructed (a) not to surrender honestly held beliefs and (b) if jury could not reach a unanimous sentencing verdict trial court would impose life without parole).

26. *Mooney*, 990 P.2d at 893 (where last *Allen* charge was two hours previous to instruction at issue, trial court erred in failing to admonish jury to hold to conscientiously held convictions).

27. 21 O.S.1991, § 701.11.

bility of parole or imprisonment for life with the possibility of parole.

¶ 29 The State argues that Hooks waived this claim when trial counsel asked for "the *Allen* instruction." The State claims counsel referred to OUJI–CR (2d) 10–11, which was given. While the discussion is confusing, when read as a whole the record shows trial counsel was referring to OUJI–CR (2d) 4–83. Initially the trial court read OUJI–CR (2d) 4–83. The prosecutor said that was "similar to the *Allen* charge" and said the jury had not been out long enough to justify an *Allen* charge. Trial counsel responded, "I think the *Allen* charge should be given now frankly telling them to go back and do that as opposed to anything else that we could construct." Counsel later objected to the *Allen* instruction given, stating: "We think that the *Allen* charge and instruction given is not an appropriate instruction to be given to a jury in the stage two deliberation since there is such an overlap of both moral and legal issues." These statements can only be reconciled if the first is taken to refer to OUJI–CR (2d) 4–83. Given this ambiguity and the importance of the issue, we do not apply waiver and review the subproposition on its merits.

¶ 30 OUJI–CR (2d) 4–83 became effective, with the rest of the revised criminal jury instructions, on August 1, 1996. Its advent recognized the change in law brought about by § 701.11, and altered the trial court's appropriate response to a deadlocked capital jury. Unfortunately neither the OUJI Comment nor this Court's subsequent case law has discussed or reflected that change. In several earlier cases appellants raised this issue in the abstract, claiming error where

trial courts refused to initially instruct jurors that, if they could not reach a unanimous sentencing verdict, the trial court would impose sentence. In those cases this Court quite reasonably held , such an instruction would distract the jury from its duty to assess a sentence.[28] None of those cases raised the issue in the context of a capital jury deadlocked in the second stage. However, the OUJI Comment relied on those cases when comparing the § 701.11 language with our previous holdings that the instruction was improper. This creates nothing but confusion and the trial court here understandably concluded that the Comment "does not make a lot of sense." Although the Comment is confusing, the language of the instruction itself is clear and readily understandable. We recommend that the language in the Comment be rewritten to reflect the current state of the law.

¶ 31 *Gilbert v. State*[29] posed the question: is it error to give an *Allen* charge to a deadlocked second-stage capital jury? In that case, the Petition in Error was filed in this Court June 24, 1996, and OUJI–CR (2d) 4–83 was not in effect at the time of trial.[30] We found in *Gilbert* that an *Allen* charge was not per se coercive,[31] and we confirm that conclusion now. However, *Gilbert* used the cases cited in Note 28, *supra*, to determine that an instruction on the sentencing provisions of § 701.11 would "distract" even a deadlocked capital sentencing jury.[32] As these cases did not consider the question, their authority on this issue is dubious at best. In addition, that trial court had no alternative but the *Allen* charge. The *Gilbert* Court was not faced with the choice

28. *Malone v. State*, 1994 OK CR 43, 876 P.2d 707, 713; *Ellis v. State*, 1992 OK CR 45, 867 P.2d 1289, 1300–01, *cert. denied*, 513 U.S. 863, 115 S.Ct. 178, 130 L.Ed.2d 113 (1994); *Sellers v. State*, 1991 OK CR 41, 809 P.2d 676, 691, *cert. denied*, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991); *Boltz v. State*, 1991 OK CR 1, 806 P.2d 1117, 1124–25, *cert. denied*, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109; *Fox*, 779 P.2d at 573; *Hale v. State*, 1988 OK CR 24, 750 P.2d 130, 139–40, *cert. denied*, 488 U.S. 878, 109 S.Ct. 195, 102 L.Ed.2d 164; *Johnson v. State*, 1987 OK CR 8, 731 P.2d 993, 1005, *cert. denied*, 484 U.S. 878, 108 S.Ct. 35, 98 L.Ed.2d 167 (1987). In *McCarty v. State*, 1995 OK CR 48, 904 P.2d 110, 125, we found the *Allen* instruction, coupled with

a colloquy between trial court and foreman, was not coercive in the second stage; however, OUJI–CR (2d) 4–83 had not been promulgated and there was no other instruction option available to the trial court.

29. 1997 OK CR 71, 951 P.2d 98, *cert. denied*, 525 U.S. 890, 119 S.Ct. 207, 142 L.Ed.2d 170 (1998).

30. *Gilbert*, 951 P.2d at 103, n. 1.

31. *Id.* at 116.

32. *Id.*

between OUJI CR (2d) 4–83 and OUJI–CR (2d) 10–11. Our conclusion is compelled by common sense, fairness, and the clear intent of the Legislature as expressed in § 701.11. Where a capital jury is deadlocked on the issue of punishment, the trial court should give OUJI–CR (2d) 4–83. Any previous holdings to the contrary are overruled.

¶ 32 We are left with the issue of whether the error in this case—the trial court's refusal to give 4–83—requires relief. We continue to hold that an *Allen* instruction, while no longer the appropriate instruction under these circumstances, is not per se error in the second stage of a capital case. The trial court gave the correct *Allen* instruction. We have already determined that the trial court's actions were not inherently or explicitly coercive. Given these facts we decline to grant relief for this error in instruction.[33] This proposition is denied.

¶ 33 In Proposition VIII Hooks claims the trial court erred in failing to provide guidance to the jury in response to a question which indicated a clear misunderstanding of the law. During second-stage deliberations the jury sent out a note complaining that the holdout juror, refusing to change her vote, "refers on grounds not related to the law."[34] Hooks claims this phrase indicates the jury misunderstood Oklahoma law by believing that the law might require a death sentence, and argues the trial court erred in failing to correct this misunderstanding. Hooks suggests the trial court should have emphasized that the law never requires a jury to impose the death penalty. The State cites no relevant authority to support its response, and does not discuss Hooks's cited cases.

¶ 34 A trial court has a duty of special care to evaluate jurors' understanding of the law and clear away any explicit difficulties.[35] This Court is troubled by the suggestion that the jury believed Oklahoma law required imposition of the death penalty. However, such an interpretation is pure speculation. The jury was accurately instructed that it was authorized to impose the death penalty if it unanimously found one or more aggravating circumstances, and then found that circumstance outweighed any mitigating evidence. Nothing in the instructions suggested the jury was required to impose a death sentence if it found at least one aggravating circumstance. Instruction 11 told the jury it could impose a sentence of life or life without parole even after finding aggravating circumstances outweighed mitigating circumstances. As the record does not support Hooks's assertion that the jury misunderstood the law, we find no error in the trial court's response.[36] This proposition is denied.

¶ 35 In Proposition X Hooks alleges his death sentence must be vacated because the use of victim impact evidence violated his rights. A family member gave victim impact testimony for each victim in question-and-answer format. Hooks neither cross-examined these witnesses nor objected to victim impact testimony, and has waived all but plain error. Victim impact testimony

---

33. However, I note the errors in instruction were exacerbated by the egregious errors in argument discussed in Proposition II. I believe this dangerous combination warrants relief.

34. Hooks also refers to a subsequent news article in which one juror said the holdout agreed to impose the death penalty given the confines of the law. This statement could not be used to challenge the verdict but we consider it to clarify our understanding of the jury's note.

35. *See, e.g., Weeks v. Angelone*, 528 U.S. 225, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000); *Bollenbach v. United States*, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946); *McDowell v. Calderon*, 130 F.3d 833, 837–38 (9th Cir.1997), *cert. denied*, 523 U.S. 1103, 118 S.Ct. 1575, 140 L.Ed.2d 807 (1998).

36. Hooks's claim is supported by the prosecutors' flagrant misstatements of law in argument designed to convince jurors they must reach a sentencing verdict and that a hung jury was somehow illegal. Notwithstanding the fact that correct instructions were initially given, I would conclude the misstatements of law in closing argument, plus the subsequent errors in instructing the deadlocked jury, may have encouraged and perpetuated any jurors' misunderstanding of the law. In my judgment, in combination with the errors in Propositions II and VII, this proposition requires relief. My colleagues, however, unanimously disagree with me as to this matter and I yield to their collective wisdom.

must conform to specific guidelines; the trial court must find that evidence of at least one aggravating circumstance is present before admitting the evidence; and the jury must be properly instructed on victim impact evidence.[37] The trial court made no formal finding that evidence of one or more aggravating circumstance was present in the record. However, before victim impact evidence began trial counsel stated he expected prosecutors to abide by this Court's guidelines and the statutory requirements for this evidence. The trial court agreed. All parties reviewed the victim impact instruction and agreed on the parameters of the evidence. The appropriate victim impact instruction was given. Sufficient evidence supported more than one aggravating circumstance. There is no plain error in the trial court's failure to explicitly find evidence of at least one aggravating circumstance before admitting victim impact evidence.

¶ 36 Hooks complains that Ms. Lewis should not have been allowed to give victim impact testimony regarding Evans. Lewis, Evans's aunt, testified about the effects of Evans's death on herself, Evans's daughter and father, and the extended family. Victim impact evidence is limited to the effect on a victim's immediate family, defined as "the spouse, a child by birth or adoption, a stepchild, a parent, or a sibling of each victim."[38] Victim impact testimony may be given by an immediate family member or person designated by the family to represent them at trial for this purpose.[39] We will not presume, in the face of a silent record, that Lewis was in fact the family's designated representative. However, her testimony emphasized the effect of Evans's death on her child and parent. Lewis's remarks regarding her own reactions to Evans's death may have been improper under the statute. However, this was a small portion of her testimony. Had Lewis been formally designated as the family's representative her testimony would have been proper. We find no plain error.

¶ 37 Hooks also complains that Lewis and other victim impact witnesses gave hearsay testimony regarding other family members. Victim impact evidence is intended to give a "quick glimpse" of a victim by focusing on the financial, emotional, psychological, and physical effect of the crime itself and some personal characteristics of the victim.[40] We have held the rules of evidence, including the prohibition against hearsay, apply to victim impact testimony.[41] However, the statute clearly allows one person to speak for an entire family and describe the effect of a victim's death on individual family members.[42] We reconcile this apparent conflict by finding no error where a family member or representative gives victim impact testimony on behalf of several immediate family members, as long as that testimony is otherwise admissible. Here, the five victim impact witnesses did not dwell unduly on the emotional effect of the victims' deaths. We do not agree with Hooks's claim that most of this evidence was irrelevant. Lewis's statement that Evans's father said he would never see justice for his child, then died six months after her death, was not within the bounds of appropriate victim impact testimony. We cannot say this isolated statement caused the verdict to be the result of an unreasoned emotional response.[43]

¶ 38 We have repeatedly found that victim impact evidence does not operate as a "superaggravator".[44] We decline Hooks's invitation to revisit those decisions. Any iso-

37. *Cargle v. State,* 1995 OK CR 77, 909 P.2d 806, 828–29, *cert. denied,* 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996).

38. 22 O.S.Supp.1999, § 984.

39. *Id.*

40. *Hooper,* 947 P.2d at 1104; *Cargle,* 909 P.2d at 828; 22 O.S.Supp.1999, § 984.

41. *Cargle,* 909 P.2d at 826.

42. 22 O.S.Supp.1999, § 984.

43. *Cargle,* 909 P.2d at 829.

44. *Alverson,* 983 P.2d at 519; *Lewis v. State,* 1998 OK CR 24, 970 P.2d 1158, 1176, *cert. denied,* 528 U.S. 892, 120 S.Ct. 218, 145 L.Ed.2d 183 (1999); *Hooper,* 947 P.2d at 1104; *Charm v.. State,* 1996 OK CR 40, 924 P.2d 754, 765, *cert. denied,* 520 U.S. 1200, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997); *Cargle,* 909 P.2d at 828 n. 15.

lated error in victim impact evidence did not divert the jury from its duty to make a decision through a reasoned moral response.[45] This proposition is denied.

¶ 39 In Proposition XI Hooks claims the "especially heinous, atrocious or cruel" aggravating circumstance is unconstitutional. He argues this aggravating circumstance is standardless and serves no narrowing function. He acknowledges we have consistently rejected this claim,[46] but urges us to reconsider. Hooks's reliance on *Robinson v. State*[47] is misplaced. In *Robinson* the Court found the victim was conscious and suffered physical anguish.[48] Where, as here, there is proof of conscious physical suffering or extreme mental cruelty, this Court will continue to uphold this aggravating circumstance. This proposition is denied.

### ISSUES RELATING TO FIRST AND SECOND STAGE PROCEEDINGS

¶ 40 In Proposition II Hooks argues he was deprived of a fair trial and fair sentencing hearing by prosecutorial misconduct in first stage during both argument and presentation of evidence, and during second stage argument. He failed to object to any instances of misconduct and we review for plain error only. We recognize the State's wide latitude to discuss the evidence and reasonable inferences from evidence in closing argument, and will only grant relief where grossly improper and unwarranted argument affects a defendant's rights.[49] Prosecutors misused evidence in the first stage of trial and engaged in egregiously improper argument which we have often condemned. These missteps are particularly unnecessary here, where the evidence amply supported the State's case and the jury verdicts. This Court has in the past warned prosecutors against misconduct that can endanger a case.[50] However, we do not find these errors entitle Hooks to relief. This proposition is denied.[51]

¶ 41 Hooks first complains about misleading and prejudicial evidence in first stage. Prosecutors tried to connect Hooks to the "Honchos" boots which left the bloody

---

**45.** *Hooper,* 947 P.2d at 1105; *Payne v. Tennessee,* 501 U.S. 808, 836, 111 S.Ct. 2597, 2614, 115 L.Ed.2d 720 (1991) (Souter, J., with whom Kennedy, J., joins, concurring).

**46.** *Anderson v. State,* 1999 OK CR 44, 992 P.2d 409, 424; *Alverson,* 983 P.2d at 516; *Le v. State,* 1997 OK CR 55, 947 P.2d 535, 552, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998); *Charm,* 924 P.2d at 770.

**47.** 1995 OK CR 25, 900 P.2d 389.

**48.** *Robinson,* 900 P.2d at 401–02.

**49.** *Le,* 947 P.2d at 554.

**50.** *Martinez v. State,* 1999 OK CR 33, 984 P.2d 813, 830, *cert. denied,* 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000).

**51.** I believe prosecutorial misconduct in the second stage infected the sentencing proceeding with unfairness and deprived Hooks of a fair sentencing hearing. *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). The second stage argument was especially egregious, as the misstatements of law, combined with errors in instruction (see Proposition VII), suggested that a hung jury was somehow illegal. This may have led to a misconception among the majority of Hooks's jurors (see Proposition VIII). We have repeatedly condemned the Oklahoma County District Attorney's reliance on improper argument (see cases cited in Note 55). In addition to our warnings, federal reviewing courts have also repeatedly condemned Mr. Macy and prosecutors from his office for their habitual misconduct in argument. *Fowler v. Ward,* 200 F.3d 1302, 1314 (10th Cir. 2000); *Paxton v. Ward,* 199 F.3d 1197 (10th Cir.1999); *Trice v. Ward,* 196 F.3d 1151, 1167–68 (10th Cir.1999); *Hooks v. Ward,* 184 F.3d 1206 (10th Cir.1999); *Moore v. Gibson,* 195 F.3d 1152, 1172–73 (10th Cir.1999). This Court has let this flagrant disregard of our rulings pass too long. The second stage argument here contained several comments the prosecutors knew to be error, included for the purpose of inflaming the jury's passions and encouraging a sentencing verdict based on passion or prejudice rather than the evidence. The errors in argument, combined with the errors in instructing the deadlocked jury, prejudiced Hooks's ability to receive a fair sentencing hearing. I believe the misstatements of law regarding jury nullification deprived Hooks of his right to a properly instructed capital jury, and ought to result in relief even if the other comments did not render the proceedings as a whole fundamentally unfair. *Paxton,* 199 F.3d at 1216–17; *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). While I would remand the case for resentencing as a sanction for deliberate prosecutorial misconduct, my colleagues disagree. I yield to them on this issue.

print in the bedroom. Prosecutors asked four witnesses what kind of footgear Hooks usually wore in 1992, and all agreed he wore work boots. Prosecutors did not show these witnesses the demonstrative "Honchos" work boots during their testimony. However, contrary to Hooks's claim, evidence suggests some of the witnesses had seen those boots during interviews with police. Prosecutors may, as Hooks suggests, have feared witnesses would disagree and deliberately avoided using the demonstrative boots during their testimony. We will not hold that this strategic decision, which could certainly be argued to the jury, constitutes misconduct.

¶ 42 Prosecutors did present misleading evidence in questioning Hooks's former girlfriend, Ms. McClain. McClain was initially confused but testified Hooks wore lace-up work boots similar to ones the officers showed her. The prosecutor was apparently not satisfied and asked whether McClain hadn't testified that way in the preliminary hearing and if she had lied to that judge. McClain responded that she had so testified and had not lied. In fact, McClain did not testify about Hooks's boots during the preliminary hearing. The questioning prosecutor was present at preliminary hearing and we must assume he was aware of this. This question led the witness into perjury and may have bolstered her testimony in jurors' minds. Nonetheless we find this error did not affect the verdict and does not require relief.

¶ 43 Hooks next complains the prosecutor should not have argued in closing that Hooks's presence at trial allowed him to hear the State's evidence and then create a story to fit it. The United States Supreme Court recently found this argument was not an impermissible comment on a defendant's right to testify, or an infringement on his right to confront witnesses or on the requirement he be present at trial.[52] Given this precedent we decline to find error.

¶ 44 Hooks claims prosecutors erred in several comments during second stage closing argument. Most of the statements are borderline at best. Each claim is set forth below.[53]

¶ 45 Hooks claims the prosecutor misstated the law when he argued the victims were people and their families were their lives. In context, the prosecutor was urging the jury not to think of the victims as merely objects in the medical examiners' pictures and drawings, but to look at the victim impact evidence to understand who they were. The suggestion the victim impact evidence should be used as substantive evidence comes close to error. However, the comment is a reasonable attempt to humanize the victims based on the evidence.

¶ 46 Hooks claims the prosecutor misstated the law when he urged jurors to apply this standard to the heinous, atrocious or cruel aggravating circumstance: "[W]hat would you call it if someone did it to you. Or worse, your sister, your mother, your daughter, your aunt, your niece? Is that torture? Is that serious abuse?" This, of course, misstates the "heinous, atrocious, or cruel" test, which requires serious *physical* abuse. More importantly, it directs jurors to find this aggravating circumstance based on their own sympathies for the victim, by inserting jurors' emotions into the victims' place, rather than analyzing whether the victims' actual situation fit within the legal restrictions on this aggravating circumstance. This combination of misstated law and encouraging sympathy for the victims is error.

¶ 47 Hooks claims the prosecutors argued facts not in evidence by stating the victims were kidnapped. These comments (Hooks complains of one instance, but Mr. Miller and Mr. Macy each argued it) were apparently references to the fact that each woman was gagged and some were bound. The references, although based on evidence, were inflammatory considering that kidnapping was not charged. This erroneous argument dangerously skirts the border of impropriety.

---

52. *Portuondo v. Agard,* 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000).

53. In Subproposition B(6) Hooks cites an argument against mitigating evidence that does not appear in the transcripts in any argument. Accordingly the claim is not reviewed.

¶ 48 Hooks claims correctly that the prosecutors misstated the law and diminished the jury's individual sense of morality and mercy. Both prosecutors vigorously argued against the prospect of a hung jury. Mr. Miller began by thanking the jurors for their work first stage and commenting that the system would grind to a halt if jurors did not deliberate and come to a disposition in cases so justice could be done. Mr. Miller also told jurors to enforce the law and operate within the law. Mr. Miller later anticipated trial counsel's reminder that it took only one juror to avoid the death sentence, by labeling this "jury nullification". Miller read a dictionary definition and told jurors this would impede or attempt to prevent enforcement of the law. He said one or two people could cripple the system, cut it up and eviscerate it. He urged all jurors to work through the sentencing decision with vigor, as "The 12 of you must resolve this case." Mr. Macy argued that legally, any one juror could control the trial but there were twelve chairs there so the defendant could be tried by his peers (emphasizing the plural). He then remarked, "There's been far too much work go into this case. It's far too important in this case for someone to play martyr and trying to hang it up."

¶ 49 This Court is concerned about these misstatements of law. First, all twelve jurors do not have to unanimously agree in capital sentencing proceedings. Second, the failure to agree does not amount to jury nullification. Oklahoma law specifically provides that the jury may not reach a unanimous verdict.[54] As the law provides for this result, failure to agree cannot be said to impede or obstruct it. Third, deadlocked juries are instructed not to abandon their honestly held convictions or concur in a verdict which they cannot in good conscience accept (as this jury was, see Proposition VII) while attempting to resolve their differences. The closing arguments complained of here suggest jurors should in fact abandon their honestly held beliefs if those beliefs will result in a less than unanimous verdict. These

misstatements of law could have deprived Hooks of his right to a properly instructed capital jury, and come close to requiring relief even if the other comments did not render the proceedings as a whole fundamentally unfair. We note, however, that despite these erroneous arguments the jury was deadlocked for several hours. We must conclude that the jurors in this case were not misled. Capital cases will not always present such a clear indication of the jury's understanding. We thus strongly caution prosecutors against using this argument during the second stage of a capital trial.

¶ 50 Hooks claims prosecutors erred in arguing both that lots of people do drugs but don't kill, and that Hooks could get drugs in prison. There was no evidence introduced regarding access to drugs in prison, and the prosecutor should not have suggested it. In context, this remark does not excite societal alarm. The prosecutor also noted that if drugs were the only factor most of the State's witnesses would be killers and even people who got drugs in prison weren't mass murderers. The misstatement of fact does not warrant relief.

¶ 51 Hooks claims Mr. Miller gave his personal opinion regarding the death penalty. He argued the district attorneys struggled when determining to seek the death penalty and did not celebrate when a death verdict was received, and "I wouldn't be involved if there was." He also referred to capital cases as "the most grueling part of my job." While this may be an improper and irrelevant comment on the prosecutor's state of mind, it is not a personal opinion regarding the justification for the death penalty in this case.

¶ 52 Hooks finally complains of two arguments—the infamous "three hots and a cot" and the exhortation to the jury to "pray if you want to." This Court has repeatedly condemned both these arguments and warned these same prosecutors to stop using them.[55] The Court even recently re-

---

54. 21 O.S.1991, § 701.11.

55. *Powell v. State*, 2000 OK CR 5, 995 P.2d 510, 539; *Washington v. State*, 1999 OK CR 22, 989

P.2d 960, 978, 979 n. 18; *Short v. State*, 1999 OK CR 15, 980 P.2d 1081, 1105, *cert. denied*, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683

versed a case partially on the strength of this improper argument.[56] The Oklahoma County District Attorney office is ignoring this Court's direction. Although we cannot condone this practice and once again direct prosecutors to refrain from this type of argument, we conclude that the error here does not require relief.[57]

¶ 53 In summary, prosecutors skirted the border of impropriety or engaged in outright improper argument in both first and second stage. However, after a thorough review of the entire record we conclude the prosecutorial misconduct did not affect Hooks's rights, and does not require relief. Proposition II is denied.

 ¶ 54 In Proposition IV Hooks argues he was denied effective assistance of trial counsel. To prevail, Hooks must show counsel's performance was so deficient that he did not have counsel as guaranteed by the Sixth Amendment, and that the deficient performance created errors so serious as to deprive Hooks of a fair trial with reliable results.[58] In capital cases, there must be a reasonable probability that, absent errors, the jury would have concluded the balance of aggravating and mitigating circumstances did not support a death sentence.[59] A reasonable probability is one sufficient to undermine confidence in the outcome of the case.[60] We presume counsel's conduct was profes-

sional and equaled sound trial strategy.[61] We consider the challenged conduct on the facts of the case as viewed at the time and ask if it was professionally unreasonable, then consider whether the error affected the jury's judgment.[62] To determine whether counsel's acts or omissions were outside the wide range of professionally competent assistance, we consider whether counsel fulfilled the function of making the adversarial testing process work.[63] We need not determine whether counsel's performance was deficient if we find no prejudice.[64] Using this standard of review counsel was not ineffective and this proposition should be denied.[65] We cannot agree, however, with the State's argument that the record shows counsel was a zealous advocate. For example, contrary to the State's assertion, counsel did not file "a substantial number" of pretrial motions. Counsel filed two—a general discovery motion and a request to withdraw from the case for Hooks's failure to pay for services.

 ¶ 55 Hooks first complains counsel failed to properly marshal the evidence rebutting the State's case in closing argument. He admits counsel did argue that the State's evidence did not prove his guilt, and did set forth an alternate theory based on Hooks's testimony. While counsel's closing argument slightly misstated both the State's evidence and Hooks's story, these misstate-

(2000); *Torres v. State*, 1998 OK CR 40, 962 P.2d 3, 18, *cert. denied*, 525 U.S. 1082, 119 S.Ct. 826, 142 L.Ed.2d 683 (1999); *Ochoa v. State*, 1998 OK CR 41, 963 P.2d 583, 601, *cert. denied*, 526 U.S. 1023, 119 S.Ct. 1263, 143 L.Ed.2d 358 (1999); *Le*, 947 P.2d at 554; *Duckett v. State*, 1995 OK CR 61, 919 P.2d 7, 19, *cert. denied*, 519 U.S. 1131, 117 S.Ct. 991, 136 L.Ed.2d 872 (1997); *Robinson*, 900 P.2d at 400; *Mitchell v. State*, 1994 OK CR 70, 884 P.2d 1186, 1202, *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995); *Jones v. State*, 1987 OK CR 103, 738 P.2d 525, 529, 531. *See also Powell*, 995 P.2d at 542–43 (Chapel, J., dissenting) (noting prosecutors apparently chose to ignore Court's explicit warning, states "I believe we should no longer let this error pass.")

56. *Washington*, 989 P.2d at 979.

57. I recognize the majority of the Court finds this blatant disregard of our decisions not itself reversible. As stated above, but for my colleagues' votes, I would grant relief as a sanction for these deliberate violations of law.

58. *Alverson*, 983 P.2d at 510; *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069–70, 80 L.Ed.2d 674, 693 (1984).

59. *Ullery v. State*, 1999 OK CR 36, 988 P.2d 332, 351; *Hooper*, 947 P.2d at 1111.

60. *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000).

61. *Le*, 947 P.2d at 556.

62. *Hooper*, 947 P.2d at 1111.

63. *Le*, 947 P.2d at 556.

64. *Alverson*, 983 P.2d at 510.

65. Hooks's Application for Evidentiary Hearing on Sixth Amendment Claims, filed February 29, 2000, is **DENIED**.

ments were to Hooks's benefit. We will not find counsel's performance deficient where counsel used the evidence to argue that the State had not proved Hooks guilty.

¶ 56 Hooks next complains counsel was ineffective for failing to obtain his work boots from his family before trial began. As we have determined that the verdicts were not affected by the trial court's error in refusing to admit the boots, Hooks cannot show he was prejudiced by this omission.

¶ 57 Hooks claims counsel was ineffective for failing to object to erroneous and inappropriate prosecutorial remarks and tactics. We found in Proposition II that the State (a) overstepped the bounds of proper argument and (b) erred in its presentation of evidence tending to connect Hooks with the "Honchos" boots. However, those errors did not affect the verdicts. As Hooks was not prejudiced by the State's misconduct, counsel cannot have been ineffective for failing to object to it.

¶ 58 When Hooks took the stand counsel made sure the jury knew Hooks had prior convictions for rape and assault with intent to commit bodily harm. Hooks now complains this trial strategy was unreasonable. He suggests counsel should first have moved the trial court to rule these prior convictions unavailable for impeachment purposes. Prior convictions may be used to impeach a witness.[66] In ruling on their admissibility the court must consider (1) their impeachment value; (2) the time of the convictions and the defendant's subsequent history; (3) the similarity between the prior and charged crimes; (4) the importance of the defendant's testimony; and (5) whether credibility is central to the trial.[67] We disagree with Hooks's claim that the prior offenses were so similar to the charged crime of murder as to automatically prejudice the jury against him. Hooks's prior convictions were relevant for impeachment purposes and admissible, and their probative value for im-

peachment was not outweighed by the danger of prejudice. As the prior convictions were admissible and would have been used for impeachment, counsel was not ineffective for omitting to ask the trial court to prohibit the State from using Hooks's priors.

¶ 59 Hooks finally claims counsel was ineffective for failing to object to improper victim impact evidence. The trial court held a brief hearing before · admitting the evidence and correctly instructed the jury on its use. We reviewed the victim impact evidence in Proposition X and concluded that any isolated errors did not affect the verdict. As Hooks cannot show prejudice, we will not find counsel ineffective.

¶ 60 Finally, in Proposition XII Hooks claims the accumulation of error in his case deprived him of due process and a reliable sentencing proceeding. We have found error in Propositions II, III, V, VI, VII and VIII. The evidentiary errors in Propositions III, V and VI had no effect on the verdicts. Taken cumulatively, their effect is no greater. The errors in instruction in Proposition VII were magnified by the prosecutors' egregious misstatements of law in Proposition II and may have led to a misunderstanding of law detailed in Proposition VIII. However, we find the combination of errors did not infect the trial or sentencing proceeding with unfairness, and does not require relief.[68] This proposition is denied.

## MANDATORY SENTENCE REVIEW

¶ 61 In accordance with 21 O.S. 1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances. Upon review of the record, we cannot say the sentence of death was imposed because the jury was influenced by passion, prejudice, or any other

66. 12 O.S.1991, § 2609.

67. *Gilbert v. State*, 1988 OK CR 289, 766 P.2d 361, 363; *Robinson v. State*, 1987 OK CR 195, 743 P.2d 1088, 1091.

68. *Skelly v. State*, 1994 OK CR 55, 880 P.2d 401, 407. As I indicated above, I believe the combination of errors in Propositions II, VII and VIII made the sentencing proceeding fundamentally unfair.

arbitrary factor contrary to 21 O.S.1991, § 701.13(C).

¶ 62 The jury was instructed on and found the existence of two aggravating circumstances: (1) that Hooks had been previously convicted of a felony involving the use of threat of violence to the person, and (2) that the murders were especially heinous, atrocious or cruel. The jury was instructed on seventeen mitigating factors.[69] Upon our review of the record, we find the sentence of death to be factually substantiated and appropriate.[70]

¶ 63 Finding no error warranting modification, the judgment and sentence of the District Court of Oklahoma County is **AFFIRMED.**

STRUBHAR, P.J.: concur.

LUMPKIN, V.P.J.: concur in results.

JOHNSON, J.: concur.

LILE, J.: concur in results.

LUMPKIN, Vice–Presiding Judge: concur in result.

¶ 1 I agree that Appellant's convictions and sentences should be affirmed. I write separately because I disagree with the analysis on several points.

¶ 2 In Proposition I, Appellant claims the evidence was insufficient to convict him of first degree murder. The opinion correctly notes that circumstantial evidence was a strong component of the State's case. However, direct evidence was also presented as to the charge of murder. The most that can be said regarding the evidence is that it was composed of both direct and circumstantial evidence. Due to that fact, the proper standard is that this Court will view the evidence in the light most favorable to the State and determine if any rational trier of fact would have found essential elements of crime beyond a reasonable doubt. See Drew v. State, 771 P.2d 224, 227 (Okl.Cr.1989); Spuehler v. State, 709 P.2d 202, 203–204 (Okl.Cr.1985). This parsing of the evidence is one of the reasons I have previously stated my belief this Court should adopt a unified Spuehler-type approach to evaluate sufficiency of the evidence in all cases, whether they contain both direct and circumstantial evidence, or whether they contain entirely circumstantial evidence. See White v. State, 900 P.2d 982, 993 (Okl.Cr.1995) (Lumpkin, J., specially concurring). I continue to urge my colleagues to review the flawed premise upon which this Court has continued to apply a reasonable hypothesis test in the review of evidence. The application of the reasonable hypothesis in this case presents a prime example why a unified approach would be clearer and more concise.

¶ 3 I also disagree with the Court's analysis in Proposition VII where Appellant argues his jury was coerced into returning a death sentence. A review of the transcript in this case makes it clear the judge and

69. Instruction 10 stated Hooks: (1) was a good son to his mother, never caused trouble at home, aided her financially and helped with farm chores; (2) was gainfully employed all his life; (3) worked in the community and volunteered labor for the elderly and poor; (4) volunteered help with gardens and cut firewood for others; (5) assisted neighbors and family members with money and labor; (6) was a good son to his father, was trustworthy and always there if needed; (7) cared for the family farm animals and neighbors' animals; (8) was a good brother to his eight siblings and would volunteer help for them; (9) was someone his siblings could always count on; (10) was a good brother-in-law to Linda Hooks, would houseclean and prepare her children's evening meal; (11) served his country for five years in the National Guard; (12) helped his brother, Earl, financially and with chores; (13) was one family member the family said they could always count on; (14) was loving, caring and kind until he became addicted to drugs; (15) volunteered many hours repairing and rebuilding the Holdenville Greater Shiloh Baptist church, and volunteered his time to repair the pastor's home and car; (16) started the integration process at Moss School without any problems and was always polite to teachers and staff; (17) helped a dying elderly neighbor by cutting his wood for the winter and feeding his livestock without pay.

70. This Court did not have available to it certain documentary exhibits during the pendency of this appeal. These documentary exhibits, including the DNA printouts and reproductions of the "Honchos" bootprint, were thoroughly described and discussed in several witnesses' testimony. Examination of this physical evidence was not necessary to determine the resolution of the issues raised on appeal.

attorneys clearly knew the distinction between an *Allen* Instruction, as set out in OUJI–CR (2d) 10–11, and the Death Penalty Proceedings–Deadlocked Jury Instruction contained in OUJI–CR (2d) 4–83. Initially, we should remember the giving of further instruction in a criminal case is a matter left to the discretion of the trial judge. Historically, our cases have provided for the additional deadlocked jury instruction if a jury is unable to reach a verdict within a reasonable time. Determination of what is reasonable is best left to the judge who has tried the case. In this particular case, the judge and attorneys were particularly aware of the amount of time the trial had taken and the amount of time taken in deliberation in the first stage and second stage of trial. When the issue was first raised regarding an *Allen* charge, the jury had only been in deliberations for about four (4) hours. (Tr. 2068) At the time the *Allen* charge, OUJI–CR (2d) 10–11, was given, the Court advised the jury, "this case has taken approximately 57 hours of trial time. You have deliberated for approximately six and one half hours." (Tr. 2072) As the Court reflected later, the jury had deliberated 12 or 13 hours in the guilt stage. (Tr. 2080)

¶ 4 When the issue of the *Allen* Instruction was first raised, it was in response to the trial court's inquiry of counsel as to their desired response to the request of the jury to replace a juror with an alternate. (Tr. 2067) To that question, the Assistant District Attorney responded, "what does the deadlock instruction say?", to which defense counsel added, "it's one that you give every time." It was the trial court that raised the question of OUJI–CR (2d) 4–83. As the court was speaking about that Instruction, defense counsel interrupted the court and stated, "I have had that given—I'm sorry. Excuse me. It appears it has to be after an extended period of time." (Tr. 2067–2068) Following the State's objection to that charge, defense counsel responded, "I think the *Allen* charge should be given now frankly telling them to go back and do that as opposed to anything else that we could instruct." (Tr. 2068) The final resolution of that discussion was that the *Allen* charge would not be given because it was too soon in their deliberations for an

*Allen* charge. The agreed response was going to be that the law did not authorize the court to grant the request and that the jury should continue their deliberations.

¶ 5 During the above discussion, an additional note was received from the jury which advised the court the jury was not able to reach a unanimous sentence. At that juncture, the decision was made to give the *Allen* charge as set out in OUJI–CR (2d) 10–11. To that decision, defense counsel made the following objection:

"We object to that, Your Honor.—and we think that the *Allen* charge and instruction given is not an appropriate instruction to be given to a jury in the stage two deliberation since there is such an overlap of both moral and legal issues and therefore we object.

We also request that the Court ask the jury—since they say that they're deadlocked, ask if any further deliberations would be beneficial to this jury before even considering the *Allen* charge.

And then as I said on the record, we object to the *Allen* charge in the second stage of this trial as not sufficient in verbiage to fully explain the sentencing phase of a death penalty case."

Thereafter the court did administer the *Allen* charge as Jury Instruction No. 15.

¶ 6 The instruction given is a correct statement of law and is a correct instruction to allow the jurors to further deliberate with the admonition that jurors should not surrender their honest convictions in arriving at a decision. This instruction was correct and appropriate under the facts of this case.

¶ 7 The Court's opinion in this case seems to infer "recent" changes to 21 O.S.1991, § 701.11, which necessitate this Court's ruling regarding the requirement to give OUJI–CR (2d) 4–83. The history of this statute and our jury instructions does not support this analysis. The provisions of our current Section 701.11 have been in effect since 1987. This is not a new statute. While OUJI–CR (2d) 4–83 is a relatively recent addition to the Uniform Jury Instructions, it is not a new instruction as to its concept. The original Oklahoma Uniform Jury Instructions–Crimi-

nal were adopted in 1981. OUJI–CR (1st) 442 was the uniform instruction for Death Penalty Proceedings Closing Charge. As of the date of that original publication, OUJI–CR (1st) 442 had as a final paragraph with its preparatory instruction the following:

[IF JURY HAS NOT RETURNED A VERDICT WITHIN A REASONABLE TIME RETURN JURY TO COURT AND GIVE THE FOLLOWING INSTRUC-TION:]

HAVE YOU REACHED A UNANI-MOUS VERDICT? [*NOTE: IF AN-SWER IS 'NO' GIVE THE FOLLOWING:* IF ON FURTHER DELIBERATION YOU ARE UNABLE TO AGREE UNANIMOUSLY AS TO PUNISH-MENT, I SHALL DISCHARGE YOU AND ·IMPOSE A SENTENCE OF IM-PRISONMENT FOR LIFE.

¶ 8 The fact that this type of instruction has been a part of the Uniform Jury Instruc-tions since their inception indicates that more weight should be given to our prior case law relating to this type of jury instruction. More to the point, it is readily apparent the OUJI–CR Committee merely removed the last paragraph from OUJI–CR 442 and cre-ated a separate instruction for that para-graph in OUJI–CR (2d) 4–83.

¶ 9 In *Johnson v. State*, 731 P.2d 993, 1005 (Okl.Cr.), *cert. denied*, 484 U.S. 878, 108 S.Ct. 35, 98 L.Ed.2d 167 (1987), the Court ad-dressed the provisions of 21 O.S.1981, § 701.11, which stated that "if the jury can-not within a reasonable time agree to punish-ment, the judge shall dismiss the jury and impose a sentence of imprisonment for life". The Court further stated:

... such a statutory injunction is "an in-struction for the trial court, not for the jury." *Coulter v. State*, 438 So.2d 336, 346 (Ala.Cr.App.1982). It would amount to an invitation to the jury to avoid the difficult duty of passing sentence upon the life of the accused. (internal cites omitted)

¶ 10 In *Fox v. State*, 779 P.2d 562, 574 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777, (1990) the Court was requested to reconsider its prior holding that the jury does not need to be instructed concerning Section 701.11. In response to

that request, the Court stated, "[w]e remain convinced that the jury should not be con-cerned with the trial court's supervisory role. Such an instruction could improperly distract the jury from performing its duty of assess-ing the sentence ." *Id. See also, Boltz v. State*, 806 P.2d 1117, 1124–25 (Okl.Cr.), *cert. denied*, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991).

¶ 11 In *Ellis v. State*, 867 P.2d 1289, 1300 (Okl.Cr.1992), *cert. denied*, 513 U.S. 863, 115 S.Ct. 178, 130 L.Ed.2d 113 (1994) the Court addressed the issue of the application of OUJI–CR (1st) 442. The *Ellis* opinion re-flects that on five occasions during the jury's deliberations, defense counsel requested the trial court give the final portion of OUJI–CR (1st) 442. *Ellis*, 867 P.2d at 1300–1301. Each request was refused and the jury was permitted to deliberate for over seventeen hours before reaching a verdict. This Court found the length of the jury's deliberations were not unreasonable under the circum-stances of the case and that the trial judge did not abuse his discretion by refusing to give the requested instruction or to take the case from the jury. *Id.*

¶ 12 More recently, in *Malone v. State* 876 P.2d 707, 713 (Okl.Cr.1994), we reiterated the principle that this Court's jurisprudence has consistently held an instruction pursuant to 21 O.S.1981, § 701.11 was improper because it invites the jury to avoid its difficult duty to pass sentence on the life of an accused.

¶ 13 While this Court has consistently held that an instruction based on Section 701.11 would improperly distract the jury from per-forming its duty of assessing the sentence, it has also stated that if a trial judge gives that instruction, it is not an abuse of discretion. See *Darks v. State*, 954 P.2d 152, 166 (Okl.Cr. 1998); *Hayes v. State*, 738 P.2d 533, 541 ·(Okl.Cr.1987).

¶ 14 Based on the historical perspective of our jury instructions and case law, I believe the opinion is in error when it infers the Uniform Jury Instruction Committee has overlooked or missed any changes in the law. The Notes on Use to OUJI–CR (2d) 4–83 in fact state what this Court has said in its cases. The Uniform Jury Instruction Com-

mittee has been extremely diligent and professional in ensuring it provides to us through the jury instructions, committee comments, and notes on use only the law as it has been adjudicated and determined by this Court. It does not seek to say what the law should be; it merely reflects what we have held the law is. That the type of instruction at issue here has been with us since the inception of the Uniform Jury Instructions–Criminal indicates that our case law has been based upon an informed and intentional interpretation of the statute. I agree with that case law.

¶ 15 The jury should be given every reasonable opportunity to arrive at a decision through its deliberative process. If there are difficulties in arriving at a unanimous decision after a reasonable time, it is appropriate to give an *Allen* charge as set out in OUJI–CR (2d) 10–11. That charge reminds the jury of the importance of their duties, it reemphasizes the importance of each individual decision and encourages those jurors who may have honest beliefs as to the weight and effect of the evidence that has been presented to them not to abandon those beliefs. At the same time, it requires them to realize the importance of the role they play in our judicial system. I do not believe OUJI–CR (2d) 4–83 should ever be given in isolation, but only at the trial judge's discretion after the initial *Allen* charge and after the jury has had an opportunity to further deliberate pursuant to that *Allen* charge. As counsel recognized in the record in this case, OUJI–CR (2d) 4–83 should only be given after an extended period of deliberations when the impasse of the jury is such it is unlikely they will be able to resolve their differences to arrive at a unanimous verdict.

¶ 16 I also disagree with a reference to a newspaper article identified in footnote 34. This matter is not a part of the record before this Court and should not be considered by the Court for any purpose.

¶ 17 I have also reviewed the transcripts relating to the claim of prosecutorial misconduct as to closing arguments. I agree that failure of a prosecutor to adhere to rulings of this Court in the scope and type of closing argument as has been discussed and ruled upon in the opinions of this Court is a breach of professional conduct. If this Court, or members of the Court, believe a "egregious" breach of duty has been performed by an attorney then it is incumbent on us to refer the matter for proper bar discipline. While I find some of the argument inappropriate and unwarranted, I cannot find any error which would require relief in this case.

¶ 18 I continue to believe this Court should fully articulate the reasons for denying applications for evidentiary hearings pursuant to Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (1998). However upon review of the application in its entirety, I agree the application and affidavits do not contain sufficient evidence show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained of evidence.

¶ 19 I am authorized to state Judge Lile joins in this writing.