O’BRIEN, Circuit Judge,
concurring and dissenting.
After a twelve day trial and thirteen hours of deliberation, an Oklahoma jury convicted Danny Hooks of five counts of first degree murder for the brutal slayings of five women. After a one day sentencing hearing and approximately eight hours of deliberation, the jury sentenced him to death on each count. After a thorough review of the trial record and the record of state post conviction proceedings the Oklahoma Court of Criminal Appeals (OCCA) unanimously affirmed the convictions and death sentences. After careful consideration of the record, the federal district court denied habeas relief. I join the majority opinion in denying habeas relief on the guilt phase issues, but respectfully dissent from its conclusion that the five death sentences were constitutionally infirm.
The majority opinion is studious and thorough. It convincingly demonstrates that the OCCA may have erred in considering the ultimate issue, whether the jury’s verdict was coerced. Were this case here on direct review I could comfortably join. But it is not.
The decisions of the OCCA are entitled to substantial deference. The Supreme Court has made that abundantly clear, particularly of late, by repeatedly reversing courts of appeals for over-reading its *756 precedents. Substantial deference does not mean abject deference; I fully understand. Such labeling may have emotional appeal, but it does not inform the debate. The touchstone of habeas review in this case is the reasonableness of the OCCA’s decisions. That is my focal point; I have neither said nor implied that the general reasonableness (or reputation) of any judge or court is in play. And my purpose is not to “rehabilitate” the prosecutors. The OCCA has clearly said the prosecutors’ arguments were out of bounds and amounted to prosecutorial misconduct. But it also unanimously held, correctly in my view, that their remarks did not so poison the well so as to deny Hooks a fair sentencing hearing. The majority studiously avoids saying the OCCA unreasonably applied federal law in so concluding, but then it goes to great length in accusing the prosecutors of sowing the devil’s seed and reaping the harvest of one lost soul. On that narrow point, if Supreme Court precedent is being unreasonably applied it comes from the hand of the majority, not the OCCA.
The majority identifies no violation of federal law in the instruction to the jury, initially or during deliberations, and the trial judge’s possible mismanagement of the jury may deserve criticism but is not, by itself, a basis for habeas relief. Unless prosecutorial misconduct clearly and irretrievably mislead jurors and infected the jury’s deliberations the majority’s reason for affording habeas relief fails, even under its accumulation theory; not because it is wrong but because, in a broad view of the facts, the OCCA’s contrary conclusion (no jury coercion) is not unreasonable.
While acknowledging deference is due to state judicial decisions the majority says “The deference accorded [the OCCA] decision ... is not abject, and the record in this case so overwhelmingly demonstrates the jury’s death sentences were coerced that the OCCA’s contrary decision is not just wrong, it is unreasonable. See Snow, 474 F.3d at 696 (noting that despite § 2254(d)’s high standard, it does not require ‘abject deference’ on the part of this court, ...)” Majority Op. at 741. After listing the events it views as “an ever-rising tide of coercion” it concludes “the record in this case so indicates jury coercion that it was an unreasonable application of Lowenfield [v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) ] for the OCCA to deny Hooks relief.” Id. at 741-42. Strong stuff. At the risk of joining the OCCA and the district court in being labeled unreasonable in the assessment of Constitutional imperatives in this case, I disagree.
I.
I start by charting our limited role in habeas cases, such as this. My understanding of it apparently differs, at least in application, from that of the majority. The Supreme Court has explained how the sails should be trimmed:
Th[e] question is not wh[at] the trial judge should have [done.] It is not even whether it was an abuse of discretion for her to have done so — the applicable standard on direct review. The question under AEDPA is instead whether the determination of the [State] Supreme Court ... was “an unreasonable application of ... clearly established Federal law.” § 2254(d)(1).
We have explained that “an unreasonable application of federal law is different from an incorrect application of federal law.” Indeed, “a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or in *757 correctly.” Rather, that application must be “objectively unreasonable.” This distinction creates “a substantially higher threshold” for obtaining relief than de novo review. AEDPA thus imposes a “highly deferential standard for evaluating state-court rulings,” and “demands that state-court decisions be given the benefit of the doubt.”
Renico v. Lett, ■ — • U.S. -, 130 S.Ct. 1855, 1862, — L.Ed.2d-(2010) (citations omitted).
It has repeatedly emphasized that in implementing the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) a federal court may disturb a state-court ruling only when the law being applied is “clearly established” and the application of that “clearly established” law is unreasonable.[1] “[The] Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.” Knowles v. Mirzayance, — U.S. -, 129 S.Ct. 1411, 1419, 173 L.Ed.2d 251 (2009) (quotations omitted); see also Wright v. Van Patten, 552 U.S. 120, 126, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008) (per curiam) (“Because our cases give no clear answer to the question presented, ... it cannot be said that the state court unreasonably applied clearly established Federal law.”) (quotations and alterations omitted); Schriro v. Landrigan, 550 U.S. 465, 478, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007) (Supreme Court had never addressed “a situation in which a client interferes with counsel’s efforts to present mitigating evidence .... ”); Carey v. Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (“This Court has never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial.”): Early v. Packer, 537 U.S. 3, 11, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (“Even if we agreed with the Ninth Circuit majority ... that there was jury coercion here, it is at least reasonable to conclude that there was not, which means that the state court’s determination to that effect must stand.”).
In Mirzayance, the Court reviewed the Ninth Circuit’s conclusion that, to be of effective assistance to a capital defendant, counsel must pursue what he reasonably believes to be a futile defense because there was nothing to lose by doing so. Bewildered by such an expansive reading of Strickland, the Supreme Court reversed, saying: “This Court has never established anything akin to the Court of Appeals’ ‘nothing to lose’ standard for evaluating Strickland claims.” Mirzayance, 129 S.Ct. at 1419. Mirzayance thus punctuates the key requirement of the AEDPA, 28 U.S.C. § 2254(d)(1) — a federal court may not grant a state prisoner’s habeas application unless the relevant state-court decision “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” Id. at 1418 (quotations omitted).
The rigor of that requirement was reinforced again this term in Berghuis v. Smith, — U.S. -, 130 S.Ct. 1382, 1392, 176 L.Ed.2d 249 (2010) (“[0]ur Duren decision hardly establishes — no less ‘clearly’ so — that Smith was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the *758 community.”)[2] and in Thaler v. Haynes, — U.S. -■, 130 S.Ct. 1171, 1175, — L.Ed.2d - (2010) (“Accordingly, we hold that no decision of this Court clearly establishes the categorical rule on which the Court of Appeals appears to have relied, and we therefore reverse.... ”).[3] Our task is to first look for “a specific legal rule” that has been “squarely established” by the Supreme Court. Mirzayance, 129 S.Ct. at 1419. The majority says Lowenfield established such a rule. Let’s see.
Lowenfield claimed the trial court violated his Constitutional rights by giving an “Allen ” jury charge and polling the jury. The Supreme Court said:
We hold that on these facts the combination of the polling of the jury and the supplemental instruction was not “coercive” in such a way as to deny petitioner any constitutional right. By so holding we do not mean to be understood as saying other combinations of supplemental charges and polling might not require a different conclusion. Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body.
Lowenfield, 484 U.S. at 241, 108 S.Ct. 546. The majority seizes on the last sentence as the yardstick by which the OCCA’s treatment of this case must be measured. But an entitlement to an “uncoerced verdict” is hardly a specific legal rule. The sentence is so general as to offer no guidance beyond the specific holding dictated by the facts of that case — jury polling and an Allen charge in that case did not amount to coercion.[4] As to what does constitute jury coercion, Lowenfield is no more revealing than saying a defendant is entitled to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). But unlike Strickland and it’s progeny, which at least provide guidance for its applica *759 tion,[5] Lowenfield, establishes nothing more than a general (perhaps merely aspirational) principle without a hint as to how courts are to determine whether a Constitutional violation occurred. When such a general standard is involved, as in Strickland analysis, “a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.” Mirzayance, 129 S.Ct. at 1420; see also Lett, 130 S.Ct. at 1864 (“This type of general standard triggers another consideration under AEDPA ... the nature of the relevant rule that the state court must apply.”) (quotations omitted); Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (“[Evaluating whether a rule application was unreasonable requires considering the rule’s specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.”). Our review of the OCCA’s decision in this case should be “doubly deferential,” Mirzayance, 129 S.Ct. at 1420, since no specific violation of the U.S. Constitution is identified.
II.
The keystone of the majority’s cascading-errors-inescapably-lead-to-eoercion analysis[6] is the prosecutors’ “misstatements of law.” And the label course[7] consists of a series of suppositions — 1) the jury was actually misled about the need for unanimity in applying mitigating facts to the ultimate decision (even though the jury instructions were abundantly clear and correct on the point), 2) the jury’s ambiguous note to the court necessarily exposed juror confusion, and 3) there is a clear cause and effect relationship between the actions of the prosecutors and the presumed jury confusion. According to this theory, because the jury’s possible misunderstanding went uncorrected during the jury deliberation process, the verdict was coerced. The OCCA saw it differently.
To decide whether the OCCA’s decision to the contrary is “objectively unreasonable,” or even wrong, we must take a close look at the events, especially the prosecutors’ arguments, in context. The majority does so selectively, and thus fails to pro *760 vide necessary context. It decries Prosecutor Miller’s remarks, that it is not easy “asking 12 strangers that don’t know each other to come into the room here and listen to all of this and end up with unanimity going in the same direction.” Majority Op. at 734. But at that point, Miller was recalling for the jurors their guilt phase deliberations and urging them to continue the deliberative process in the same spirit. Because the closing arguments are critical to the majority’s coercion theory, a more complete airing is necessary. Miller said:
Because you all play a role in this. It’s a deliberative process. That’s why we have 12. That’s why we ask you to deliberate. Because it allows the world, a rational thinking world anyway to know with great certainty that at least within our human capabilities everything has been done and everything has been talked about to come to a fair conclusion. Fair to everyone. And that’s what you all did.
Now it is no easy task and we all recognize it. It is certainly nothing easy about asking 12 strangers that don’t know each other to come into the room here and listen to all of this and end up with unanimity going in the same direction. It’s a tremendously difficult process and we know that.
But again, it’s the best system in the world. And it requires, though, these 12 people, these 12 strangers to come together and collaborate, discuss, make a decision. The system would actually grind to a halt. Think about it. It would grind to a screeching halt if juries didn’t come together and do that.
If we couldn’t depend on 12 citizens to come together and go in the same direction, then we would never have a verdict. There would never be a disposition. Defendant’s [sic] would go back to jail and wait for the next trial and they’d go back to jail and wait for the next trial and no one would ever be acquitted and no one would ever be sent on to the penitentiary.
So what you went through the last few days is exactly what everyone that sits in the chairs goes through, and fortunately, by far and away, the great majority come to a decision that we all can live with and justice can be done now that is your role. That’s what we want you to do.
As you each agreed in voir dire, every single one of you would not be sitting here unless you agreed in unanimity that the defendant was guilty then each of you said you would fully and fairly consider all three possible punishments not to the exclusion of any but all three. Now is that time.
But you can’t even do that yet. You couldn’t even do that because there are so many systems within this system to make sure the defendant is protected. You couldn’t even do all three unless the state could first prove that at least one of the statutory aggravators existed. There are eight of them and we’ve alleged six.
(Tr. of Proceedings, Stage II, Vol. IX at 2021-22) (emphasis added).
He then started talking about the six aggravating factors the state had alleged (the instructions clearly informed the jurors that the state was obligated to prove each aggravator beyond a reasonable doubt to their unanimous satisfaction). Miller claimed the state had proved all six aggravators and started detailing the proofs. As he got to the fourth aggravator he digressed to speak of the time and effort the state spent to insure a fair trial for Hooks and contrasted Hooks’s unceremonious execution of the victims. He commented about how we afford such *761 rights to criminal defendants because it is the law. He then made the jury nullification remarks condemned by the majority.
Now I suggest that Mr. Box will probably say something to the affect that someone on this jury could hold up a decision. He will likely tell you that it just takes one person to stop all this. That is such a common argument down here that it’s got a name. It’s called jury nullification.
Nullification means an action impeding or attempting to prevent the operation or enforcement of the law. Websters. Nullification means an action impeding or attempting to prevent the operation of the law.
In other words, to nullify a jury, a jury’s job, a jury’s efforts really requires only convincing one or two people to cripple it, to stop it. And while I don’t want to beat this down I have got to tell you one more time that that’s not what we’re about. This system, and I remind you, is about deliberation. To do otherwise eviscerates the system. It cuts it up literally. It cuts it up. The very law that we live by. The 12 of you must resolve this case, all 12,1 suggest.
Now you worked through in stage one and I asked you to all, every one of you give it equal vigor. Give it more vigor, if necessary, to work through it now. Decide what’s appropriate for him.
(Id. at 2028.) Immediately after those words he discussed the fifth aggravator (committing these crimes while being a parole absconder) and then moved on to the continuing threat aggravator. His statements regarding “jury nullification”[8] were made in the middle of and, to my lights, in connection with his argument about proving aggravators. It seems he was arguing that no juror should ignore the obligation to deliberate with respect to aggravating factors because unanimity was required as to each before it could be considered in the ultimate calculus. And with respect to finding aggravators, individual jurors do not have the same latitude to “vote their conscience” irrespective of the facts as they do in ultimately deciding whether the death sentence is appropriate.
After going through each aggravator Miller turned to a discussion of mitigating factors. Significantly he made no mention of jury nullification while speaking about mitigating factors. He suggested the claimed mitigating factors did not amount to much but he did not misrepresent the law as to how the jury, or individual jurors, should ultimately use them.
Analyzing whether prejudice sufficient to “render petitioner’s trial unfair” is evident on the record, a totality of the circumstances approach is necessary. Darden v. Wainwright, 477 U.S. 168, 183 n. 15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). There was no objection to the prosecutors’ remarks and defense counsel’s rebuttal was more than “simply noting for the jury that the defense ‘will ask and tell [the jury] that it only takes one’ because ‘that happens to be the law in Oklahoma.’ ” Majority Op. at 734. Defense counsel stated:
All of you told me you could be your own person and that you could stay with what you thought was right, if you thought it was right. And evidently *762 during the [guilt] deliberation there was some that had differences of opinions and those persons changed.
As we go into this stage of the trial, as the state said earlier, that we will ask and tell you that it only takes one. Well, the reason we tell you that is that happens to be the law in Oklahoma. If one of you — now you don’t all have to reach a unanimous verdict in this case so don’t be misled and think that. You do not have to do that. You do not.
If you — one of you believes the appropriate penalty — and each of you told me when we asked you to start with that you do believe in a ease where there were five deaths that you could consider, legitimately consider all three penalties. At this point and time when you go back to deliberate this case you all don’t have to decide. The state said you all have to make a decision. You all have to decide. You don’t have to do that.
If one of you, two of you or more of you believes that the penalty should be less, one penalty or the other, you must stay with that position. And when you return your verdict you do not have to say you are all unanimous or you will be here for the rest of your days or hours. One person can say I do not want death, two, any number can and there’s not a death penalty.
(Tr. of Proceedings, Stage II, Yol. IX at 2037-38.) Defense counsel clearly informed the jury a unanimous verdict was needed only to impose the death penalty, as the court’s instructions clearly provided.[9]
A totality of circumstances analysis must also include both the prosecutors’ and defense counsel’s reference to voir dire in closing arguments. The jury’s contemplation of its role at the penalty phase was discussed well before the closing arguments at sentencing. The jury voir dire contained significant discussions of the jurors’ responsibility to consider all three sentencing options — death, life without the possibility of parole and life with the possibility of parole.
After the defendant’s closing argument, Prosecutor Macy addressed the jury. He spent some time discussing the gruesome facts of the multiple murders, some of the sentencing aggravators, and Hooks’s lifestyle. He then remarked on the irony of Hooks asking for mercy when he showed none to his victims. He spoke of the difficult job the jury did during the guilt phase and then said:
We know that you’re getting ready to face the toughest part of your job in just *763 a few minutes. Mr. Box mentioned that any one of you can control the result in this trial and you can do that legally. But ladies and gentlemen, there is not one chair up there. There’s 12. Twelve chairs. And there’s 12 chairs for that purpose. The Constitution of the United States guarantees a person a trial by a jury of his peers, not by one person, by a jury of his peers. There’s been far too much work gone into this case. It’s far too important in this case for someone to play martyr and try to hang it up.
(Id. at 2057-58 (emphasis added).)
Nothing more was said about a single juror possibly thwarting the will of other jurors. Prosecutor Macy went on to discuss “the two lives of Danny Hooks.” (Id. at 2058.) He referred to the testimony about his family and upbringing and contrasted it with his other life — his drug and alcohol abuse, his sexual proclivities, his prior kidnapping and rape conviction, these violent murders and his lack of remorse. There was no mention of jury nullification and no further mention of what was required to obtain or avoid the death penalty. Macy’s acknowledgement that a lone juror can prevent the death penalty, but should not on the facts of this case, cannot be so prejudicial as to render the sentencing fundamentally unfair. The OCCA so concluded. I agree.
One could put a more sinister spin on the prosecutors’ words, as the majority does. The majority may be wrong in its darker musings, but it is not unreasonable. The converse is also true. The OCCA may have been wrong in assessing the prejudicial effect of what it determined to be prosecutorial misconduct, but not even the majority claims its decision incorrectly or unreasonably applied Supreme Court precedent. See Darden, All U.S. at 180, 106 S.Ct. 2464 (“The relevant question is whether the prosecutors’ comments ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ ”) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). And it cannot be an unreasonable application of Lowenfield’s extremely general statement.[10] Deference *764 is due the OCCA’s decision irrespective of whether it has articulated its reasons to our satisfaction.[11] We are not here to grade its papers, but to assess the results of its efforts as directed by the AEDPA.
To set up the straw man it purports to topple, the majority uses snippets from the OCCA opinion, saying, for instance: “Thus, it seems apparent Miller’s and Macy’s misconduct invaded Hooks’s Eighth Amendment rights by suggesting ‘jurors should in fact abandon their honestly held beliefs if those beliefs will result in a less than unanimous verdict.’ ” Majority Op. at 744 (quoting Hooks v. Okla., 19 P.3d 294, 316 (Okla.Crim.App.2001)). The entire quote is as follows:
The closing arguments complained of here suggest jurors should in fact abandon their honestly held beliefs if those beliefs will result in a less than unanimous verdict. These misstatements of law could have deprived Hooks of his right to a properly instructed capital jury, and come close to requiring relief even if the other comments did not render the proceedings as a whole fundamentally unfair. We note, however, that despite these erroneous arguments the jury was deadlocked for several hours. We must conclude that the jurors in this case were not misled.
Hooks, 19 P.3d at 316 (emphasis added).[12]
The expanded quote highlights the fact that the OCCA did not shy away from what it considered the seriousness of the prosecutorial misconduct or its effect.[13] The OCCA majority opinion concluded:
These missteps are particularly unnecessary here, where the evidence amply supported the State’s case and the jury verdicts. This Court has in the past warned prosecutors against misconduct that can endanger a case. However, we *765 do not find these errors entitle Hooks to relief.
Hooks, 19 P.3d at 314.[14] The OCCA went on to say: “In summary, prosecutors skirted the border of impropriety or engaged in outright improper argument in both first and second stage. However, after a thorough review of the entire record we conclude the prosecutorial misconduct did not affect Hooks’s rights, and does not require relief.” Id. at 317. In a concurring opinion Judge Lumpkin, joined by Judge Lile, also addressed the attorney misconduct issue, saying:
I agree that failure of a prosecutor to adhere to rulings of this Court in the scope and type of closing argument as has been discussed and ruled upon in the opinions of this Court is a breach of professional conduct. If this Court, or members of the Court, believe a[sic] “egregious” breach of duty has been performed by an attorney then it is incumbent on us to refer the matter for proper bar discipline. While I find some of the argument inappropriate and unwarranted, I cannot find any error which would require relief in this case.
Id. at 322.
On several occasions in the majority and concurring opinions the OCCA expressed serious concerns with the prosecutors’ arguments and its consideration of their conduct. A careful reading of the transcript suggests the majority may have been overwrought with the prosecutors’ remarks. Nonetheless, the OCCA prudently resisted the temptation to reverse as a sanction for their misconduct. Considering the arguments and instructions it concluded the jurors “were not misled” and “the prosecutorial misconduct did not affect Hooks’s rights, and does not require relief.” Id. at 316, 317. If we accord AEDPA deference to the OCCA we cannot conclude its determination was an objectively unreasonable application of federal law. In any event, while the prosecutors’ remarks were erroneous, they were not, fairly regarded, an invidious part of “an ever-rising tide of coercion,” as the majority claims. Majority Op. at 741.
III.
The next (chronological) issue has to do with the jury note. The OCCA described Hooks argument on direct appeal:
Hooks claims the trial court erred in failing to provide guidance to the jury in response to a question which indicated a clear misunderstanding of the law. During second-stage deliberations the jury sent out a note complaining that the holdout juror, refusing to change her vote, “refers on grounds not related to the law.” Hooks claims this phrase indicates the jury misunderstood Oklahoma law by believing that the law might re *766 quire a death sentence, and argues the trial court erred in failing to correct this misunderstanding. Hooks suggests the trial court should have emphasized that the law never requires a jury to impose the death penalty.[15]
Hooks, 19 P.3d at 312. The OCCA said it “is troubled by the suggestion that the jury believed Oklahoma law required imposition of the death penalty. However, such an interpretation is pure speculation.” Id. It reviewed the jury instructions and concluded there was no error as the jury was accurately advised of the law, specifically that it could impose a life sentence even if it found one or more aggravating circumstances outweighed mitigating circumstances.
The majority does not specifically address the issue as framed by the OCCA. Instead it redirects the inquiry, saying, “It is clear the prosecutors’ misconduct achieved its intended purpose: the jury was misled to believe it was the obligation of a juror holding a minority opinion to abandon that opinion if it was necessary for the jury to reach a unanimous sentence.” Majority Op. at 746.[16] That is certainly an inference one could draw from the enigmatic note and circumstances surrounding it. But its inference is not necessitated by the language of the note or the record. Other explanations are certainly not beyond the pale — the juror may have engaged in fanciful speculation about facts not in evidence or sought to base a decision on the character of the victims, perhaps by refusing to consider the death penalty because the victims were “crack heads.” We can’t know for sure what motivated the note, but speculation cannot inform the debate, whether it is mine or the majority’s. Certainly the note is part of the overall prejudice calculus — the OCCA assigned it little or no weight because its meaning was speculative; the majority assigns it great weight. One may be right and the other wrong, but that does not make either unreasonable.
As the OCCA noted, none of the jury instructions, either at the guilt or penalty phase, misstated the law. Ten minutes after its first note, the jury informed the court it could not unanimously impose a death penalty — reflecting a correct understanding of the law. And that brings us to the Allen issues.
IV.
As the majority acknowledges, an Allen charge is an acceptable method of encouraging juries to reach a difficult decision. But the issues surrounding the giving of *767 an Allen instruction in this case are somewhat unique. The trial judge at first refused to give any Allen instruction because the jury had not deliberated for sufficient time. While it might have been better to have given the instruction requested by defense counsel, refusing to do so, particularly in the early stages of deliberation, does not appear to be contrary to federal law. See Jones v. United States, 527 U.S. 373, 381-82, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). Best practices cannot translate into constitutional imperatives.
The Allen charge ultimately to be given is an issue of state law. The OCCA recognized the Allen instruction ultimately given in this case should have been tailored to the death penalty, but it also specifically held that the instruction given was not a misstatement of Oklahoma law — “[t]he trial court gave the correct Allen instruction.” Hooks, 19 P.3d at 312.
The majority concludes the Allen instruction finally given was coercive because it “suggested the case against Hooks would not be completed in the absence of unanimity.” Majority Op. at 749 (emphasis added). However, the majority ignores the plain language of the instruction:
This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinions of other jurors or because of the importance of arriving at a decision. No juror should ever agree to a verdict that is contrary to the law in the court’s instructions, nor find a fact or concur in a verdict which in good conscience he or she believes to be untrue.
State Court Record at 300 (emphasis added). As noted by the OCCA, this is the last instruction the jury received and it ties to the other instructions clearly telling the jury unanimity is required only to impose the death penalty, not to avoid it, and a death sentence need not be imposed even if the aggravating factors outweigh the mitigating factors. See n. 9, supra.
There is no reason to think any juror would assume deliberations would be interminable and the trial court is not required to tell them the effect of their failure to agree. Jones, 527 U.S. at 381, 119 S.Ct. 2090. This jury deliberated for thirteen hours in the guilt phase, but only eight in the penalty phase. A trial judge may have an obligation to end deliberations at some point and impose a life sentence. But, jurors are made of pretty stern stuff and the trial judge is in the best position to assess whether the process has overburdened any of them. See Lett, 130 S.Ct. at 1863 (“the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate.” (quotations omitted)). And state appellate courts are well able to correct abuses. Absent specific guidance from the Supreme Court, which Hooks has not identified, such decisions ought not to be micromanaged by federal courts.
V.
I am not convinced the OCCA’s decisions, which studiously inquired into each error alleged by Hooks, passed the edge of reasonableness. The instructions contained no legal error. Prosecutor Miller’s erroneous closing arguments were temporally related to his discussion of aggravating factors. They were followed by defense counsel’s rebuttal emphasizing that the death penalty could not be imposed if any juror thought it inappropriate even if the aggravating factors outweighed the mitigating factors. Prosecutor Macy’s argument acknowledged the law as stated by *768 defense counsel (single juror death penalty veto) but argued it should not be done in this case. He did not mention jury nullification. The presiding juror’s note requesting removal of another juror contains little insight as to its meaning and shortly thereafter the jury sent a note correctly stating the law — it could not reach a unanimous decision on imposing the death penalty. The jury then received a proper Allen charge reminding all jurors not to surrender honest convictions to the will of the majority. The only other communication with the jury concerned the logistics of sequestration.
In sum, the OCCA identified trial errors relating to Oklahoma law. It also identified and employed the proper federal law for assessing the impact of those errors of state law — whether, taken as a whole, the errors denied Hooks a fair sentencing hearing. At the end of the day it decided the errors, alone or in combination, did not entitle Hooks to relief. The OCCA also identified and applied the general Lowenfield requirement that a defendant is entitled to an uncoerced jury decision. It concluded the sentencing jury was not coerced. I am not sure it was correct in that assessment but I join the district court in concluding its decision was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, especially if its decision is afforded proper deference. It was not unreasonable for the OCCA to conclude the horrific facts of this case (multiple murders by a previously convicted kidnapper/rapist), rather than a possible misunderstanding of the law or the stresses of jury service, motivated the jury to recommend five death sentences.
We have an interesting circumstance here. If the opinion of the district judge who originally considered these habeas claims is included, two federal judges think the OCCA’s assessment of the federal Constitutional issues was not objectively unreasonable and two think it was objectively unreasonable. The State of Oklahoma is left with the resulting detritus. So much for applied federalism and comity-
And where does our decision leave the State? It can accept a federal court veto of the jury’s sentencing decision and settle for a life sentence. Or it can empanel a new jury, which will not have heard the guilt phase evidence, and hope to convince the new jury to ratify the trial jury’s sentences. And it will have to do so at least eighteen years after the murders were committed and time has scattered witnesses, eroded memories, rusted the community’s sense of outrage with this mass murder, dulled the voices of the victims’ families and turned the fire in the prosecutors’ bellies to ash (because the attention of new prosecutors has been diverted to more recent atrocities and the task of resurrecting and presenting a very old case to an uniformed jury is daunting, indeed).

. The phrase "clearly established Federal law, as determined by the Supreme Court of the United States ... refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.” Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

. In Berghuis, the Court reversed the Sixth Circuit's determination that the Michigan Supreme Court had unreasonably applied Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), when it rejected the defendant's argument that African-Americans had been systematically excluded from the jury pool. The Court stated: “As the Michigan Supreme Court correctly observed, ... neither Duren nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools.” Berghuis, 130 S.Ct. at 1393. Because the Michigan court’s ruling that Smith had failed to prove a systematic exclusion was not unreasonable, “the Sixth Circuit had no warrant to disturb it.” Id. at 1388.

. In Thaler, "the question [was] whether any decision of th[e] Court 'clearly establishes' that a judge, in ruling on an objection to a peremptory challenge under Batson v. Kentucky, ... must reject a demeanor-based explanation for the challenge unless the judge personally observed and recalls the aspect of the prospective juror's demeanor on which ble explanation is based.” 130 S.Ct. at 1172 (citation omitted). "Batson requires a judge ruling on an objection to a peremptory challenge to undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.... This general requirement however, ... did not clearly establish the rule on which the Court of Appeals' decision rests.” Id. at 1174 (quotation and citation omitted). Batson noted the need for a judge ruling on an objection to a peremptory challenge to "tak[e] into account all possible explanatory factors in the particular case.” Batson v. Ky., 476 U.S. 79, 95, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (quotation omitted). But Batson plainly did not go further and hold that a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror's demean- or. Id.

. The facts in Lowenfield are, admittedly, less unsettling than these, but nothing in that decision suggests its unique facts establish a floor for future reasonableness determinations, as the majority implies.

. A convicted defendant’s claim that counsel’s assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel’ guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland, 466 U.S. at 687, 104 S.Ct. 2052. And "it is the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution.” Bobby v. Van Hook, - U.S. -, 130 S.Ct. 13, 20, 175 L.Ed.2d 255 (2009) (J. Alito concurring) ("I see no reason why the ABA Guidelines should be given a privileged position in making that determination.”).

. Such an approach avoids cumulative error analysis wherein specific errors of Constitutional dimension are first identified and the cumulative effect of those identified errors are then considered (factors not amounting to error are excluded from the analysis). See United States v. Rivera, 900 F.2d 1462, 1470 (10th Cir.1990) (en banc) ("a cumulative-error analysis aggregates only actual errors to determine their cumulative effect.”).

. The course of bricks forming an arch and lying into the keystone. See http://www. gobrick.com/BIA/technotes/t31 .htm (last visited May 11, 2010).

. Miller's statements about jury nullification were improvident, unnecessary (because of strength of the state’s case), and unfortunate — a circumstance clearly addressed by the OCCA. But in the context of arguing that the jury should (unanimously) find the aggravating factors to be proved (beyond a reasonable doubt) I don't see them as prejudicing Hooks, particularly not to the extent that he was deprived of a fair trial. The OCCA saw it the same way. Was the OCCA wrong? Maybe. Unreasonable? Hardly.

. Generally, "arguments of counsel ... carry less weight with a jury than do instructions from the court.” Waddington v. Sarausad, - U.S. -, 129 S.Ct. 823, 827, 172 L.Ed.2d 532 (2009). Instruction No. 14 stated: "In the event you assess the death penalty, your verdict must be unanimous. You may also return a unanimous verdict of imprisonment for life without the possibility of parole or imprisonment for life with the possibility of parole.” (R. Vol. II at 299 (emphasis added).) Instruction 8 told the jury "Should you unanimously find that one or more aggravating circumstances existed beyond a reasonable doubt, you are authorized to consider imposing a sentence of death. If you do not unanimously find beyond a reasonable doubt that one or more of the aggravating circumstances existed, you are prohibited from considering the penalty of death.” {Id. at 291 (emphasis added).) Instruction 11 informed the jury: "If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances. Even if you find that the aggravating circumstances outweigh the mitigating circumstances, you may impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole.” {Id. at 295.)

. The majority relies upon a phrase in Romano v. Oklahoma, "the jury must not be misled regarding the role it plays in the sentencing decision.” 512 U.S. 1, 8, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). That reference is puzzling in that Romano held only that the admission of a prior death sentence did not deprive Romano of a fair sentencing proceeding. Id. at 12-13, 114 S.Ct. 2004. Over reading Supreme Court precedent is precisely the reason the Supreme Court reversed in Lett, Berghuis, Thaler, Mirzayance, Van Patten, Alvarado, Landrigan, Carey and Early.
Romano did, however, summarize how the Supreme Court viewed Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), saying:
The prosecutor in Caldwell, in remarks which "were quite focused, unambiguous, and strong,” misled the jury to believe that the responsibility for sentencing the defendant lay elsewhere. Id., at 340, 105 S.Ct., at 2645. The trial judge "not only failed to correct the prosecutor's remarks, but in fact openly agreed with them.” Id., at 339, 105 S.Ct., at 2645.
The plurality concluded that the prosecutor's remarks, along with the trial judge’s affirmation, impermissibly "minimize[d] the jury’s sense of responsibility for determining the appropriateness of death.” Id., at 341, 105 S.Ct., at 2646.
[W]e have since read Caldwell as "relevant only to certain types of comment — those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.” Darden v. Wainwright, 477 U.S. 168, 184, n. 15, 106 S.Ct. 2464, 2473, n. 15, 91 L.Ed.2d 144 (1986). Thus, "[t]o establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.” Dugger v. Adams, 489 U.S. 401, 407, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989); see also Sawyer v. Smith, 497 U.S. *764 227, 233, 110 S.Ct. 2822, 2826-2827, 111 L.Ed.2d 193 (1990).
Id. at 8-9, 114 S.Ct. 2004.

. "Avoiding these pitfalls [decisions contradicting governing law announced by the Supreme Court or arriving at a result different from Supreme Court precedent on materially indistinguishable facts] does not require citation of our cases — indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.” Early, 537 U.S. at 8, 123 S.Ct. 362 (emphasis in original).

. The majority discounts the OCCA's consideration of the time spent in deliberations stating “[t]he record simply reveals that one single juror was unconvinced, at least for a period of time ...” Majority Op. at 745. It then speculates that "the passage of time does not rule out the possibility that other jurors also favored a life sentence, but acquiesced in a death sentence because they believed holding out would amount to, in the words of Miller, 'impeding or attempting to prevent the operation or enforcement of the law.' ” Id. at 745. This type of conjecture has no place in our deferential review under the AEDPA.

. As the majority acknowledges, the OCCA identified the specific misstatements and discussed the seriousness of the prosecutors' misconduct. However, as the majority also acknowledges, prosecutorial misconduct does not compel a finding of coercion.
Improper prosecutorial argument will only warrant federal habeas relief if it renders a petitioner's trial or sentencing fundamentally unfair. To establish that a prosecutor's remarks were so inflammatory that they prejudiced substantial rights, a petitioner must overcome a high threshold: he or she must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that absent the remarks, the jury would not have imposed the death penalty.
Short v. Sirmons, 472 F.3d 1177, 1195 (10th Cir.2006) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), and Berger v. United States, 295 U.S. 78, 89, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).

. The majority opinion was written by Judge Chapel and joined by Judges Strubhar and Johnson. In a footnote, apparently joined by no other judge, Judge Chapel expressed a personal opinion that prosecutorial misconduct infected the sentencing, entitling Hooks to relief. He was also concerned that official judicial condemnation of the practices of that office had failed to arrest offending conduct and, in part, reversal was necessary to send an effective message. He concluded by saying: "While I would remand the case for resentencing as a sanction for deliberate prosecutorial misconduct, my colleagues disagree. I yield to them on this issue.” Hooks, 19 P.3d at 314, n. 51 (emphasis added). I am not sure what to make of the footnote, it does not appear to be a dissent. But one thing is clear — the two concurring judges clearly and expressly said it was inappropriate to impose a reversal and retrial as a sanction on prosecutors. Those judges properly restricted their analysis to possible prejudicial affect. Apparently the other judges in the majority at least implicitly adhered to that more circumspect reasoning as the court clearly held the misconduct did not prejudice Hooks’s trial rights.

. The manner in which the note was handled is also part of Hooks’s more general complaint about juror coercion.

. The majority faults the OCCA for failing to consider the "refers on grounds not relevant to the law” note in determining that the prosecutors' statements did not mislead the jury, Majority Op. at 745-46, n. 28, and concludes the note can be read but one way. Id. at 745. But, the OCCA did discuss the note. Hooks, 19 P.3d at 312. The fact that it did not specifically mention it in its discussion of prosecutorial misconduct is insignificant. The Supreme Court dealt with a similar argument in Early v. Packer (reversing the Ninth Circuit):
The contention that the [state] court “failed to consider” facts and circumstances that it had taken the trouble to recite strains credulity. The Ninth Circuit may be of the view that the Court of Appeal did not give certain facts and circumstances adequate weight (and hence adequate discussion); but to say that it did not consider them is an exaggeration.... Compliance with Lowenfield v. Phelps, does not demand a formulary statement that the trial court’s actions and inactions were noncoercive "individually and cumulatively.” It suffices that that was the fair import of the Court of Appeal's opinion.
537 U.S. at 9, 123 S.Ct. 362.